765 So.2d 917 (2000)
Barry Joseph RAYL, Appellant,
v.
STATE of Florida, Appellee.
No. 2D99-620.
District Court of Appeal of Florida, Second District.
August 25, 2000.
Robert Augustus Harper and Jason Michael Savitz of Robert Augustus Harper Law Firm, P.A., Tallahassee, for Appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Stephen D. Ake, Assistant Attorney General, Tampa, for Appellee.
THREADGILL, Acting Chief Judge.
The appellant, Barry J. Rayl, challenges a judgment and sentence for second-degree murder with a firearm. He argues that the trial court erred in denying his motion for judgment of acquittal on that charge. We agree and, therefore, reverse and remand for the conviction to be reduced to manslaughter with a firearm.
*918 The evidence presented at jury trial revealed that the appellant and the victim, William Ingram, had known each other for approximately one year. Ingram's wife worked for the appellant. The appellant testified that he and the victim had always gotten along well. He stated, however, that the victim sometimes drank heavily, and when he did, he became belligerent.
On the day of the shooting, the victim called the appellant's residence ten to fifteen times, leaving messages for the appellant. At that time, the Ingrams were separated, and the victim wanted the appellant to fire the victim's wife. The appellant believed the victim wanted his wife to be fired so that she would take him back. Initially, the calls were non-threatening. As the day went on, however, the victim sounded more and more intoxicated and he began threatening to kill the appellant.
In the past, the appellant had heard numerous stories, many from the victim, regarding the victim's involvement in violent physical altercations. The stories ranged from domestic violence to barroom brawls and included an incident where the victim claimed to have killed a member of a biker gang. The victim had also bragged to the appellant that he had black belts in two different martial arts disciplines and that he could kill a man with a single punch.
The appellant owned a lingerie modeling salon. On the day in question, the victim began calling the salon, looking for the appellant. The salon employees called the appellant's home and reported that the victim was threatening to come to the salon. They said they were scared, and they threatened to close the salon if the appellant did not come there. The appellant was scheduled to work that day from 6:00 p.m. until midnight. He arrived at the salon at approximately 3:45 p.m.
When the appellant walked in, an employee advised that the victim was again on the telephone. The appellant took the phone. After calling the appellant a profane name, the victim told the appellant he would be there in five minutes and that he was going to kill him. The appellant hung up the telephone and called 911. Two deputies responded. The appellant gave them a description of the victim and his vehicle. The deputies told the appellant they would put extra patrols in the area.
Starting at approximately 6:00 p.m., the appellant's wife called the salon several times to tell him the victim had also been calling her at home. She relayed that the victim told her he had a shotgun and was going to "blow [her] old man's brains out."
At approximately 9:10 p.m., shortly after the last call from his wife, the appellant heard the front door of the salon "bust open," and he heard the victim's voice asking where the appellant was and saying he was going to kill him. The appellant called 911. Other witnesses in the salon testified that the victim was furious, out of control, and repeatedly stated that he was going to kill the appellant. The appellant retrieved a .38 caliber handgun from his desk drawer. The victim came into the appellant's office, according to the appellant, "mad as hell." The appellant testified that the victim came toward him, and the appellant shot the victim. One of the appellant's employees, who had been in the lobby, went to the appellant's office after hearing the gunshot. She testified that she saw the victim on his knees just inside the doorway of the office. She thought she may have heard the victim say, "why did you have to do that to me?" The appellant told her to get out of there, which she believed was for her protection. As she was leaving the salon, she heard another gunshot. A moment later, the victim ran out of the salon and collapsed in the parking lot.
The appellant again called 911. The supervisor of the sheriff's office communications center testified that the call was received one minute and one second after the appellant's previous call to 911. The tapes of all the 911 calls were played for *919 the jury. In the call after the shooting, the operator asked the appellant if the victim was alive. The appellant responded that he was going to check on him, and the operator told him to stay on the phone. The appellant stated he thought the victim was just shot in the shoulder, and he repeatedly asked for an ambulance. He told the operator he wanted to go out and check on the victim. The operator told him to apply direct pressure to the bullet wound, but also that someone had to stay on the telephone. The appellant asked one of his employees to stay on the telephone while he went out and checked on the victim. The appellant testified that he saw no blood on the victim, so he went back to the salon to make sure an ambulance was coming. As he did, the deputies arrived. The victim was pronounced dead approximately one hour later.
At trial, the first deputy on the scene testified that, when he arrived, the appellant was standing approximately twenty feet away from the victim with his arms crossed. The State used this testimony, along with evidence that the appellant had received some medical training during his seventeen-year career as a correctional officer, to argue to the jury that he could have done more to help the victim after he was shot.
The medical examiner testified that the victim sustained two gunshot wounds. The first was to the front of the chest, and that bullet caused a very small nick to the heart. He testified that an individual could be active for a few minutes after sustaining that type of wound. The second bullet went through the victim's left arm as the arm was held next to his body. It then traveled through the chest cavity and into the abdomen, at a slightly downward angle. The medical examiner opined the angle indicated the victim's position was slightly lower than the assailant's. He testified the evidence could be consistent with the victim being on his knees or with the victim coming up at the shooter.
At the close of the State's case, the appellant moved for judgment of acquittal arguing, inter alia, that the State failed to prove the appellant acted with a depraved mind, a necessary element of second-degree murder. The trial court denied the motion, and the appellant renewed it at the close of all evidence. The jury was instructed on the offenses of second-degree murder and manslaughter, as a lesser-included offense.
Section 782.04(2), Florida Statutes (1997), provides that second-degree murder is the "the unlawful killing of a human being, when perpetrated by any act imminently dangerous to another and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual." To prove that an act demonstrates a depraved mind, the State must prove that it was done from "ill will, hatred, spite or an evil intent." See Fla. Std. Jury Instr. (Crim.)[98].
The only evidence presented by the State to establish a depraved mind was the fact that the victim was on his knees before the second shot was fired and the appellant's purported failure to render aid to the victim after he was shot. The witness who saw the victim on his knees, however, left before the second shot was fired. Thus, there was no evidence presented to rebut the appellant's testimony that the victim was coming out of his crouch toward the appellant at the time he fired the second shot. In addition, the fact that the defendant was standing with his arms folded when officers arrived was insufficient to prove ill will in light of evidence that the appellant did check on the victim, but saw no blood and therefore refrained from applying direct pressure to the wound. Because the State failed to establish that the appellant acted out of ill will, hatred, spite, or an evil intent, the trial court erred in denying the defense motion for judgment of acquittal on the charge of second-degree murder. See Williams v. State, 674 So.2d 177 (Fla. 2d *920 DCA 1996). We therefore reverse the appellant's conviction and remand with instructions that the trial court adjudicate him guilty of manslaughter with a firearm and sentence him accordingly.
We find no error in the remaining points raised by the appellant.
Reversed and remanded.
GREEN and STRINGER, JJ., Concur.