GROSS, J.
This is a case where intoxicated nightclub troublemakers picked one fight too many, leading to an unfortunate result. Following their third ejection from a nightclub, the victims engaged in a hostile verbal confrontation with a group of men leaving the club. When the defendant, Nareisse Antoine, intervened as peacemaker, the victims quickly turned their sights to him, hurling racial epithets while threatening violence. Initially, Antoine laughed it off and told them to go home. However, things escalated when Antoine was punched in the jaw and, according to Antoine, both victims appeared to reach for weapons; at that point, Antoine pulled out a gun and opened fire, killing one of the victims while hitting the other numerous times.
Antoine’s trial centered upon his claim of self-defense. One issue compels reversal for a new trial — the impropriety of a jury instruction which improperly tethered evidence of a victim’s reputation for vio *1068 lence to the defendant’s knowledge of that reputation. We will discuss three of the other issues raised insofar as they might impact a new trial.

The Charges and the Conviction

On July 30, 2009, Antoine was charged by indictment with two counts: (I) first degree murder with a firearm for the death of Brandon Hammond and (II) attempted first degree murder by actually possessing and discharging a firearm, thereby causing great bodily harm to Jeffrey Thompson. Following trial, the jury deadlocked on Count I but found Antoine guilty on Count II of the lesser included offense of attempted second degree murder with a firearm.[1]

The State’s Case

Central to the State’s ease was Tyrone Slade, a bouncer at Club Mystique in West Palm Beach, who was standing next to Antoine when he shot the victims. On the night of May 31-June 1, 2009, Club Mystique hosted a “private” event for a “small group of friends.” Among the attendees were Brandon Hammond and Jeffrey Thompson, two regulars known by Slade and the club’s staff. In fact, Slade was “very good friends” with Hammond’s mother and sister, but he knew Hammond to have a reputation for being violent and a drunk.
On the night in question, Hammond and Thompson were three times ejected from the club due to their confrontations with patrons. In the first instance, Slade had to take Thompson outside after he persisted in “mocking” a group of men “while they were dancing on the dance floor.” When Slade told Thompson to knock it off and relax, Thompson responded that he “d[id]n’t care” and that he would “fuck anybody up.” Hammond, however, reined in the situation, telling Slade they would “chill out” and “behave.” When Thompson agreed, the two were allowed to re-enter the club.
Later that night, the club’s owner told Slade that Hammond and Thompson needed to leave, since “they were being fresh with some ladies in the bar.” As before, Slade talked to the two outside the bar and apparently calmed them down. However, not long thereafter, Slade was forced to eject them after they invaded a group’s (“the Monarchy group”) private table area and nearly started a fight.
Despite being told to go home, Hammond and Thompson returned to the club an hour later. After parking their black BMW in a “reckless manner,” the two men approached the Monarchy group while they were leaving the club. Recognizing the prior rift, Slade asked Hammond and Thompson why they had returned. But by that point it was too late; a verbal spat had begun, with both sides threatening each other from across the street.
Antoine exited the club to this affray and told everyone to calm down. Like the victims, Slade knew Antoine from prior dealings since the two men lived in the same apartment complex. Hammond and Thompson told Antoine to “mind his business” while “[sjpewing profanity and racial slurs.” Antoine laughed it off, telling them “nobody’s here to fight” or “have a problem.”
No one heeded Antoine’s advice. Shortly after turning his attention to Antoine, Thompson began pacing back and forth, giving Slade the impression that he was about to sneak up and attack. Hammond *1069 then confronted Antoine, punched him in the jaw, and split his lip. Taking a step back, Antoine handed Slade his drink and checked his lip to see if it was bleeding. Antoine then pulled out a pistol from a holster and told Thompson and Hammond to leave, prompting the two men to take a step back.
Displaying bravado, Hammond began “reaching in his pants as if he had a gun” and asked Antoine, “Or else what, nigger?” Not sure if Hammond was armed, Slade heard Antoine ask, “Do you have a gun[?][A]re you going to shoot me?” Likewise, Slade asked several times what Hammond was reaching for and cautioned, “Don’t do this Brandon.”
The encounter reached a tipping point. Antoine opened fire, shooting Hammond six or seven times. Fearing Hammond or Thompson would retaliate with gunfire, Slade ran for cover behind a car. Although Slade could not actually see it transpire, he could tell that Antoine fired more shots at Thompson as Thompson ran away and rounded a corner.
When the smoke cleared, Slade asked Antoine “[w]hat the fuck [he was] doing.” After re-holstering his gun, Antoine responded that he “had to go.” He then went in the club, got his girlfriend, and drove off.

Slade’s Interview with the Police

Despite being an eyewitness, Slade did not initially speak to the police because he knew everyone involved and did not want to be thrown into the middle of a murder investigation. Rather, he met with an attorney who prepared a formal statement for him, which he provided to an officer friend three days later.
In addition to the statement, Slade and his attorney spoke with officers in a recorded interview. At trial, Slade averred that, at the time of the interview, he was not overly concerned about his “liability or exposure to being [criminally] charged.'®[5] Defense counsel then attempted to impeach Slade by questioning him regarding comments his attorney made to him during breaks in the interview. The State objected on hearsay grounds.[2]
Although not presented before the jury, the gist of the conversation between Slade and his attorney involved concerns that Slade had “no choice” but to do the interview “because the police were eventually going to get him.” Slade and his attorney then went on to discuss “the fact that there are cameras throughout the area where the shooting occurred, and it was clear that eventually the police would pull those videos and would know who [Slade] was.”
At a sidebar conference, defense counsel argued that the attorney’s statements were not hearsay since they were being offered to show Slade’s “state of mind and specifically his motive and bias in the testimony that he presented.” Specifically, defense counsel sought to establish that Slade’s “testimony [wa]s motivated by his own fear about either criminal or civil liability,” stemming from the incident. The trial court, however, sustained the hearsay objection.

Corroborating Evidence

Slade’s testimony was corroborated by Raymond Harley, a nighttime security guard at a nearby parking lot. Harley testified that he was dozing off in a chair outside the parking lot when he was suddenly awakened by the sound of a BMW convertible losing control and spinning out onto the sidewalk. Wondering what was going on, Harley stepped away from his post and watched from afar as the car *1070 drove erratically before parking alongside Club Mystique.
From the outside, Harley could tell that the driver of the vehicle and his passenger were “looking for trouble,” as they were “harassing a couple of people who worked there and some of the customers” who had come from the inside. Harley heard the two say, “We’ll mess you all up, F you all.”
When Antoine exited the club and tried to assist the bouncers, things “got out of hand” quickly. First, the passenger from the car punched Antoine, who then said, ‘You done messed up. God bless you.” When the passenger took another swing, Antoine turned around, took a sip of his drink, pulled out a gun, and blew a kiss. The passenger backed up, reached for his waistband, and pointed at Antoine while taunting, “[Y]ou ain’t doing nothing, I still kick your, you know.”
Antoine shot the passenger six or seven times, causing him to fall to the ground. Shocked, the driver looked like “he wanted to come help his friend, but he froze.” Antoine then told the driver, ‘You want some, too?” before walking towards him and firing six or seven more shots, causing the driver to scramble to his car. Antoine later got into his Jaguar and drove away.

Antoine’s Story

From Slade’s interview, the police learned Antoine’s address and arrested him, recovering a gun, a partially loaded magazine, and a black holster from a closet in his apartment.
Antoine provided two post-arrest statements, both of which were admitted at trial: a recorded interview just after his arrest and his grand jury testimony. Consolidating both statements for the purpose of this opinion, Antoine stated that he took his girlfriend to Club Mystique to celebrate her having finished school. In furtherance of the celebration, he purchased a $75 bottle of Ketel One vodka.
After he and his girlfriend began drinking, Antoine saw Hammond and Thompson nearly get into a fight with three Canadian gentlemen after dancing too closely to them on the dance floor. When it appeared that a fight was imminent, Antoine intervened and told Hammond and Thompson to stop and relax. Later in the night, Antoine saw one of the men initiate a second verbal fight, culminating in his ejection.
As the night wound down, Antoine closed his bottle and took it back to his car. On his way out, he saw Hammond and Thompson attempt to pick a fight with the Monarchy group. After putting his bottle in the trunk of his Jaguar, Antoine was heading back to the club when one of the victims began hurling profanities and racial slurs in his direction. Antoine shrugged it off and told him to “take [his] drunk ass home.”
Upon hearing the response, Hammond punched Antoine in the jaw while exclaiming, “[Y]ou think I’m joking, I’m going to fuck you up.” Hammond then threw a second punch, reached into his shirt for what Antoine thought was a gun, and stated, “[H]ow you like that shit now, you ain’t talking shit no more, now I’m going to fucking kill you.”[3] Having “no doubt in [his] mind that [Hammond] was going to kill [him] first,” Antoine withdrew his gun and opened fire; when he then saw Thompson come towards him and appear to reach for a gun, Antoine shot him as well. In all, the event happened very *1071 quickly and left Antoine in a state of shock.
Following the shooting, Antoine left the scene with his girlfriend and went to a friend’s home, where he took pictures of his injured lip. Antoine did not immediately call the police because he was afraid Hammond and Thompson would still be coming after him. Antoine met with an attorney at 8:00 a.m., at which point he was told to “sit tight” so they could “figure out what ... to do” next.

The Aftermath Investigation

At the time of the incident, Officer Casey Goetz was working security for a nearby bar, E.R. Bradley’s, when he heard about 8 gunshots. Officer Goetz immediately radioed dispatch before reaching Narcissus and seeing Hammond’s dead body, which was riddled with gunshot wounds, including one to the face. The officer then turned his attention to the two men’s black BMW, which was parked in a way that was “consistent with how an impaired drive[r] would park the car.” There he found Thompson gasping for air while bleeding profusely due to his gunshot wounds. Officer Goetz remained by Thompson and, with the aid of another officer, applied pressure to the wound before medical professionals arrived.
In all, Hammond sustained gunshot wounds to the left side of his face, the left side of his neck, his chest, and his abdomen. Toxicology reports revealed Hammond had a .219 blood alcohol content, along with amphetamine, metabolite of cocaine, Xanax, and marijuana in his system. Thompson, on the other hand, survived, but remained in a coma for about ten days. At the time of trial, he had no memory of any of the events surrounding the shootings.

Dr. Ahmed El Haddad

After being taken from the scene, Thompson was transported to St. Mary’s Hospital, where he was treated by Dr. Ahmed El Haddad. The doctor and his staff immediately determined that Thompson had sustained bullet wounds to (1) his right-upper chest, (2) his abdomen, and (3) his left shoulder. Since the shoulder injury was not life threatening, however, it was given far less priority.
At trial, Dr. El Haddad asked to have Thompson take his shirt off and come up to the witness stand to assist the doctor in his testimony. Upon the defense’s objection, the State assured that Thompson would serve as a mere “demonstrative aid” and would not speak.
Pointing to Thompson’s back, Dr. El Haddad explained that the gunshot wounds to Thompson’s abdomen and right-upper chest were indicative of being shot from behind. On cross examination, Dr. El Haddad testified for the first time that, “based on the other two gunshot wounds,” he could now tell that Thompson’s shoulder wound also came from the same trajectory.[4] As justification for this conclusion, the doctor explained that “the nature of what [the wound] looks like now[ ] shows ... that the entrance [came] from the back [while] the exit was from the front.” Significantly, this was contrary to the doctor’s testimony at a previous deposition, where he stated that “he could not make a determination about whether [the shoulder wound] was front to back or back to front.”

Charge Conference

Antoine contended throughout the trial that his actions were taken in self-defense — that he reasonably believed Ham *1072 mond and Thompson were about to shoot him. In furtherance of this defense, Antoine presented the testimony of a second bouncer, Mark O’Neil, who stated, as did Slade, that Hammond had a reputation for violence.
Given the existence of reputation evidence, the trial court utilized Florida Standard Jury Instruction (Criminal) 3.6(f), entitled “Justifiable Use of Deadly Force,” to craft the following jury instruction:
If you find that Brandon C. Hammond had a reputation of being a violent and dangerous person, and that their [sic] reputation was known to the defendant, you may consider the fact in determining whether the actions of the defendant were those of a reasonable person in dealing with an individual of that reputation.
At the charge conference, defense counsel objected and asked the court to remove the portions of the instruction relating to the defendant’s knowledge, explaining that “[t]he law on reputation evidence is [that] the defendant does not have to be aware of the reputation.” In addition, defense counsel requested that the trial court add an instruction which would state that if the jury found “Brandon Hammond had a reputation for being [a] violent, dangerous person” it could consider that “as to who the aggressor was.” The trial court, however, denied the request and kept the instruction as originally crafted.

Deliberations, Verdict, and Sentence

Following the first day of deliberations, the jury submitted a question asking why the verdict form did not include attempted manslaughter as a lesser included offense to Count II. After the trial court told the jury it had all the applicable instructions, the jury returned a verdict indicating it was deadlocked on the first degree murder count while finding Antoine guilty on Count II of the lesser included offense of attempted second degree murder with a firearm. Upon receipt of the verdict, defense counsel moved for a judgment of acquittal on the ground that the State failed to present evidence that he acted with a depraved mind. The motion was denied.
On June 1, 2011, the trial court adjudged Antoine guilty on the one count and sentenced him under Florida’s 10/20/Life Statute to 40 years imprisonment with a 25-year mandatory minimum. Antoine later filed a Rule 3.800 motion, alleging that, once the mandatory minimum was set at 25 years, the trial court could not enter a sentence beyond the underlying offense’s statutory maximum term of thirty years imprisonment. The trial court denied the motion.

The Evidence was Sufficient to Support the Attempted Second Degree Murder Conviction

We reject Antoine’s contention that the trial court reversibly erred in denying his post-verdict motion for judgment of acquittal for attempted second degree murder, because in the light most favorable to the State, the evidence supports the conclusion that Antoine’s shooting of Thompson “evinced a depraved mind regardless of human life.”
“ ‘The standard of review for the denial of a motion for judgment of acquittal is de novo.’ ” Segal v. State, 98 So.3d 739, 742 (Fla. 4th DCA 2012) (quoting Ortiz v. State, 36 So.3d 901, 902 (Fla. 4th DCA 2010)). Since “[t]he purpose of a motion for judgment of acquittal is to test the legal sufficiency of the evidence presented by the state,” Harris v. State, 954 So.2d 1260, 1261 (Fla. 5th DCA 2007) (citing State v. Lalor, 842 So.2d 217 (Fla. 5th DCA 2003)), the defendant making such a motion “admits the facts in evidence and every conclusion favorable to the adverse *1073 party that may be fairly and reasonably inferred from the evidence.” Richards v. State, 37 So.3d 925, 926 (Fla. 4th DCA 2010) (citing Lynch v. State, 293 So.2d 44, 45 (Fla.1974)).
Second-degree murder is “[t]he unlawful killing of a human being, when perpetrated by any act imminently dangerous to another and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual.” § 782.04(2), Fla. Stat. (2009). Within this context,
an act is imminently dangerous to another and evinces a “depraved mind” if it is an act or series of acts that: (1) a person of ordinary judgment would know is reasonably certain to kill or do serious bodily injury to another; and (2) is done from ill will, hatred, spite or an evil intent; and (3) is of such a nature that the act itself indicates an indifference to human life.
Wiley v. State, 60 So.3d 588, 591 (Fla. 4th DCA 2011) (citing Bellamy v. State, 977 So.2d 682 (Fla. 2d DCA 2008); Michelson v. State, 805 So.2d 983, 985 (Fla. 4th DCA 2001)); see also State v. Montgomery, 39 So.3d 252, 255-56 (Fla.2010). This is not to say “ ‘malice is ... limited in its meaning to hatred, ill will and malevolence’ ”; rather, it “denotes a wicked and corrupt disregard of the lives and safety of others ... a failure to appreciate social duty.” Larsen v. State, 485 So.2d 1372, 1374 (Fla. 1st DCA 1986) (quoting Hines v. State, 227 So.2d 334, 335 (Fla. 1st DCA 1969)) (internal quotation omitted).
Consistent with these principles, “second-degree murder is normally committed by a person who knows the victim and has had time to develop a level of enmity toward the victim.” Light v. State, 841 So.2d 623, 626 (Fla. 2d DCA 2003). For example, “[a] defendant who has brooded on a prior wrong and has nursed his resentment and anger into a full-blown rage is not one who lacked a depraved mind.” Haygood v. State, 109 So.3d 735, 747 (Fla.2013); cf. Gibbs v. State, 904 So.2d 432, 435 (Fla. 4th DCA 2005) (“Pointing a loaded gun at the head of the victim and then firing has frequently been held to be an act ‘imminently dangerous to another and evincing a depraved mind regardless of human life.’”). By contrast, “extreme recklessness” or “an impulsive overreaction to an attack or injury is itself insufficient” to support a second degree murder conviction. Dorsey v. State, 74 So.3d 521, 524 (Fla. 4th DCA 2011); Light, 841 So.2d at 626.
In this regard, Antoine relies upon two decisions—Poole v. State, 30 So.3d 696 (Fla. 2d DCA 2010), and McDaniel v. State, 620 So.2d 1308 (Fla. 4th DCA 1993) — to place this case within the “impulsive overreaction” confines of second degree murder jurisprudence. However, neither case controls this one, since neither involves a defendant who had the time to consider the nature of his violent act.
In Poole, the defendant stabbed the unarmed victim once with a steak knife after the intoxicated victim lunged at him while the two were confined in the closed quarters of a recreational vehicle. 30 So.3d at 697-98. Recognizing that the victim was unarmed and unaware that the defendant had grabbed a knife, the court found the defendant’s “act of stabbing [the victim] through the heart ... excessive,” permitting the jury to “reasonably reject [the defendant’s] theory of self-defense.” Id. at 699. Nevertheless, since “the evidence showed an impulsive overreaction,” the court also found the evidence insufficient to demonstrate second-degree murder since the “State failed to prove that [the defendant] acted out of ill will, hatred, spite, or an evil intent.” Id.
*1074 Similarly, in McDaniel, the defendant used a knife to ward off further attack from his son after the son punched him in the mouth and knocked him to the ground. 620 So.2d at 1308. Under these facts, we held that although the defendant’s use of the knife “may have been excessive, thereby negating a finding of self-defense, his acts did not evince a depraved mind.” Id.; see also Bellamy, 977 So.2d at 683-84 (finding that the State faded to demonstrate a depraved mind where the defendant stabbed two people during an “affray” at a nightclub after he had just been pushed to the ground and stepped on); Rayl v. State, 765 So.2d 917, 919-20 (Fla. 2d DCA 2000) (reversing a conviction for second-degree murder where the defendant shot the victim twice after the victim stormed into the defendant’s place of business and threatened to kill him).
The material distinction between the two “impulsive overreaction” cases and the instant situation lies in Antoine’s conduct prior to using deadly force. Accepting the State’s evidence as true, Harley testified that before shooting Thompson, Antoine stated, ‘You want some, too?” This statement, along with the fact that Thompson was shot in the back while running away, inferred not that Antoine was impulsively acting out of fear to save himself, but that he was administering street justice after he had been punched and insulted and after he had disposed of the first assailant. Given that intent is “a state of mind [that] must in most cases be inferred from the circumstances,” Williams v. State, 239 So.2d 127, 130 (Fla. 4th DCA 1970) (citation omitted), it cannot be said Antoine did not act with a “depraved mind,” where he taunted and shot an unarmed, fleeing assailant. Accordingly, Antoine’s motion for judgment of acquittal was properly denied.

The Jury Instruction Pertaining to a Victim’s Reputation for Violence Nulliñed the Effect of Such Testimony and was Reversible Error

The trial court erred by instructing the jury that Antoine’s knowledge of Hammond’s reputation for violence was central to the jury’s consideration of such evidence. A victim’s reputation for violence is admissible in self-defense cases, regardless of the defendant’s knowledge, to demonstrate that the victim was the aggressor. There was no evidence that Antoine knew of Hammond’s violent reputation, so the jury instruction improperly confused the issue while inviting the jury to disregard the reputation evidence entirely.
In a criminal case, a “defendant is entitled to have the jury instructed on his or her theory of defense if there is any evidence to support the theory and the theory is recognized as valid under Florida law.” Vila v. State, 74 So.3d 1110, 1112 (Fla. 5th DCA 2011) (citing Cruz v. State, 971 So.2d 178, 181-82 (Fla. 5th DCA 2007)).
Generally, “standard jury instructions are presumed correct and are preferred over special instructions.” Stephens v. State, 787 So.2d 747, 755 (Fla.2001). “However, the use of the standard jury instructions does not relieve the trial court of its obligation to determine whether the standard instructions accurately and adequately state the law.” Brown v. State, 11 So.3d 428, 432 (Fla. 2d DCA 2009) (citing Moody v. State, 359 So.2d 557, 560 (Fla. 4th DCA 1978)). In fact, the giving of a standard criminal jury instruction may sometimes even be fundamental error. See Williams v. State, 123 So.3d 23, 30 (Fla.2013). “If the trial court determines that the instruction is ‘erroneous or inadequate,’ the court may then modify the standard jury instruction as the ‘trial *1075 judge shall determine to be necessary to instruct the jury accurately and sufficiently.’” Peters v. State, 33 So.3d 812, 814 (Fla. 4th DCA 2010) (quoting Fla. R. Crim. P. 3.985).
Here, the instruction on the reputation of the victim, drawn from Florida Standard Jury Instruction (Crim.) 3.6(f) on the Justifiable Use of Deadly Force, failed to accurately and sufficiently instruct the jury. The problem with the standard instruction, and the trial court’s reliance upon it, is that the instruction fails to distinguish between the two purposes for which evidence of the victim’s character trait of violence might be offered in a self-defense ease. For one purpose, it is not necessary that a defendant be aware of the victim’s reputation for violence; for the second purpose, a defendant’s awareness of the victim’s reputation must be demonstrated.
First, in a self-defense case, “evidence of the victim’s character trait of violence ... may be offered on the issue of who was the aggressor.” Charles W. Ehrhardt, Florida Evidence § 404.6 (2012 ed.). Under section 90.404(l)(b), Florida Statutes (2012), “evidence of a pertinent character trait of the victim is admissible when it is offered by the accused to prove that the victim acted in conformity with” his character. Ehrhardt, supra, § 404.6. Thus, “evidence of the dangerous character of the victim is admissible to show, or as tending to show, that the defendant acted in self-defense.” Smith v. State, 606 So.2d 641, 642 (Fla. 1st DCA 1992) (citing Garner v. State, 28 Fla. 113, 9 So. 835, 841 (1891)).
In most self-defense cases, “[ejvidence of the victim’s reputation is admissible to disclose his or her propensity for violence and the likelihood that the victim was the aggressor,” Berrios v. State, 781 So.2d 455, 458 (Fla. 4th DCA 2001), the notion being that reputation evidence demonstrates “the ‘product of what is generally discussed in the community.’ ” Johnson v. State, 108 So.3d 707, 709 (Fla. 5th DCA 2013) (quoting Ehrhardt, supra, § 405.1); see also Larzelere v. State, 676 So.2d 394, 400 (Fla.1996). Such reputation testimony is admissible in a self-defense case “as circumstantial evidence to prove th[e victim’s] conduct,” that at the crucial time the victim acted consistently with his reputation for violence. Ehrhardt, supra, §§ 405.3, 404.6. A defendant’s prior knowledge of the victim’s reputation for violence is irrelevant when the evidence is offered on the issue of who was the aggressor, “because the evidence is offered to show the conduct of the victim, rather than the defendant’s state of mind.” Dwyer v. State, 743 So.2d 46, 48 (Fla. 5th DCA 1999); see also Melvin v. State, 592 So.2d 356, 357 (Fla. 4th DCA 1992) (holding that deceased’s reputation as a bully was admissible even though the defendant did not know of that reputation).
A second purpose to offer evidence of the victim’s character trait of violence in a self-defense ease is “to prove that the accused was reasonably apprehensive of the victim and that the defensive measures of the accused were reasonable.” Ehrhardt, supra, § 404.6; see also Arias v. State, 20 So.3d 980, 983 (Fla. 3d DCA 2009); Diaz v. State, 747 So.2d 1021, 1024-25 (Fla. 3d DCA 1999). When the evidence is offered for this purpose, “there must be evidence that the accused knew of the victim’s acts of violence or aggression.” Ehrhardt, supra, § 404.6.
Reputation testimony about a victim of a crime is often confused with evidence of prior specific acts of violence by a victim, which must be known by a defendant to be relevant to a self-defense claim. “Evidence of prior specific acts of *1076 violence by the victim is admissible,” if known by the defendant, “because it is relevant ‘to reveal the reasonableness of the defendant’s apprehension at the time of the incident.’” Hedges v. State, 667 So.2d 420, 422 (Fla. 1st DCA 1996) (quoting Smith, 606 So.2d at 642-48). “[Sjpecific acts of aggression and violence by the victim are inadmissible to prove that the victim was the aggressor and that the defendant acted in self-defense.” Ehrhardt, supra, § 405.3. For this category of evidence, a defendant’s knowledge of a victim’s specific acts of violence is a precondition to admissibility. See Singh v. State, 36 So.3d 848, 851 (Fla. 4th DCA 2010); Shreiteh v. State, 987 So.2d 761, 763 (Fla. 4th DCA 2008).
In the case at hand, the trial court relied upon Standard Jury Instruction 3.6(f) to craft the following jury instruction:
If you find that Brandon C. Hammond had a reputation of being a violent and dangerous person, and that their [sic] reputation was known to the defendant, you may consider the fact in determining whether the actions of the defendant were those of a reasonable person in dealing with an individual of that reputation.
This instruction undermined the reputation evidence offered in this case. There was no evidence that Antoine knew of Hammond’s reputation, let alone that he and Hammond had even met prior to the night of the shooting. The valid purpose for which the reputation was offered was to show that Hammond was the aggressor, proof not dependent on Antoine’s knowledge of his reputation for violence. The instruction could only have misled the jury into disregarding the presented reputation evidence.
Although the reputation evidence pertained to Hammond and not to Thompson, the two men acted in concert and the reasonableness of Antoine’s conduct must be evaluated by his response to both men. If Antoine was justified in meeting Hammond’s aggression with deadly force, it would go to explain why he felt apprehensive regarding Thompson’s conduct. Given the nature of the evidence and the jury’s difficulty in reaching a verdict, we cannot say that “ ‘there is no reasonable possibility that the error contributed to the conviction.’ ” Symonette v. State, 100 So.3d 180, 184 (Fla. 4th DCA 2012) (quoting State v. DiGuilio, 491 So.2d 1129, 1138 (Fla.1986)). This is particularly true in this case, where the State relied on the erroneous jury instruction to invite the jurors to disregard the reputation testimony.

Statements Made to Slade were not Hearsay and were Admissible in Evidence to Show Potential Bias

The trial court erred in barring the defense from cross-examining Slade regarding conversations he had with his attorney during breaks of his police interview.[5] Contrary to the court’s ruling, what the attorney said to Slade was not hearsay since the statements were not offered for their truth, but to show their impact on Slade’s state of mind and to expose potential bias.
As we wrote in Henry v. State, 123 So.3d 1167, 1169-70 (Fla. 4th DCA 2013):
“[T]he Sixth Amendment guarantees the right of an accused to attack a witness’ credibility by means of cross-examination directed toward revealing possible biases or ulterior motives of the witness as they may relate to the case at hand.” *1077 Smith v. State, 38 So.3d 871, 872 (Fla. 4th DCA 2010) (citing Davis v. Alaska, 415 U.S. 308, 315-16, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974)). “For purposes of discrediting a witness, a wide range of cross-examination is permitted as this is the traditional and constitutionally guaranteed method of exposing possible biases, prejudices and ulterior motives of a witness as they may relate to the issue or personalities .... ” Strickland v. State, 498 So.2d 1350, 1352 (Fla. 1st DCA 1986) (citations omitted). “The vital importance of full and searching cross-examination is even clearer when, as here, the prosecution’s case stands or falls on the jury’s assessment of the credibility of the key witness[].” Id. (citing Wooten v. State, 464 So.2d 640 (Fla. 3d DCA 1985)). Under such circumstances, “[ojbviously, a defendant has a strong interest in discrediting a crucial state witness by showing bias, an interest in the outcome, or a possible ulterior motive for his in-court testimony.” Livingston v. State, 678 So.2d 895, 897 (Fla. 4th DCA 1996) (citing Phillips v. State, 572 So.2d 16 (Fla. 4th DCA 1990)).
In this case, the trial court cited hearsay grounds to prevent the defense from cross-examining Slade regarding the conversations he had with his attorney during his police interview. Hearsay is “a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.” § 90.801(l)(c), Fla. ■ Stat. (2009). “If an out-of-court statement ‘is offered for some purpose other than its truth, the statement is not hearsay and is generally admissible if relevant to a material issue in the case.’ ” Massey v. State, 109 So.3d 324, 327 (Fla. 4th DCA 2013) (quoting Jackson v. State, 25 So.3d 518, 530 (Fla.2009)).
The attorney’s statements to Slade were not offered to prove the truth of the matters contained in the statements—that Slade had no choice but to submit to the police interview—but to demonstrate that the issue of criminal or civil liability weighed on Slade’s mind, potentially distorting his testimony. This was of particular significance since Slade was the State’s star witness, and a person near Antoine at the time of the shootings. The case largely rested on the jury’s evaluation of Slade’s credibility. The statements were admissible to explore Slade’s potential bias.

Under Wiley v. State, the 40-year Sentence was Improper

We address a sentencing issue because it may arise again after retrial. Antoine challenges the legality of his sentence under Florida’s 10/20/Life Statute to 40 years imprisonment with a 25-year mandatory minimum. He argues that once the mandatory minimum was set at 25 years, the trial court was not authorized to sentence him beyond the underlying offense’s maximum term of 30 years imprisonment. As a challenge to the legality of a sentence, our review is de novo. See Stoute v. State, 915 So.2d 1245, 1247 (Fla. 4th DCA 2005).
As part of Florida’s 10/20/Life Statute, section 775.087(2)(a)3., Florida Statutes (2009), provides for a mandatory minimum imprisonment term when a person discharges a firearm during an offense and causes great bodily harm. The statute provides in pertinent part:
Any person who is convicted of a felony ... regardless of whether the use of a weapon is an element of the felony, and during the course of the commission of the felony such person discharged a “firearm” or “destructive device” as defined in s. 790.001 and, as the result of *1078 the discharge, death or great bodily harm was inflicted upon any person, the convicted person shall be sentenced to a minimum term of imprisonment of not less than 25 years and not more than a term of imprisonment of life in prison.
§ 775.087(2)(a)3., Fla. Stat (2009).
In Mendenhall v. State, 48 So.3d 740, 742 (Fla.2010), the Florida Supreme Court construed this provision to provide trial courts with discretion “to impose a mandatory minimum of twenty-five years to life, even if that mandatory minimum exceeds the statutory maximum provided for in section 775.082.” However, the decision failed to address whether a trial court may impose a sentence in excess of both the mandatory minimum and maximum sentence otherwise provided by law once a mandatory minimum has been set.
This void was filled in Wiley v. State, 125 So.3d 235, 241 (Fla. 4th DCA 2013),[6] where we answered the question in the negative, explaining:
[S]ection 775.087(2)(b) provides that the mandatory minimum sentence in subsection (2)(a)3. does “not prevent a court from imposing a longer sentence of incarceration as authorized by law in addition to the minimum mandatory sentence.” (Emphasis added). From a literal reading of the statute, it appears that while a trial judge may sentence a defendant pursuant to section (2)(a)3. to a mandatory minimum sentence between twenty-five years to life, the trial judge may give a sentence over the mandatory minimum selected only if “authorized by law.”
Id. Thus, in a nearly identical situation to the case at hand, we found a 40-year sentence for attempted second degree murder with a firearm illegal since the sentence “exceed[ed] the thirty-year statutory maximum for th[e] first-degree felony offense.” Walden v. State, 121 So.3d 660 (Fla. 4th DCA 2013); see also Sheppard v. State, 113 So.3d 148, 149 (Fla. 2d DCA 2013); McLeod v. State, 52 So.3d 784, 786 (Fla. 5th DCA 2010); Wooden v. State, 42 So.3d 837 (Fla. 5th DCA), rev. denied, 51 So.3d 466 (Fla.2010).
In this case, Antoine was convicted of attempted second degree murder, a second degree felony. See §§ 782.04(2), 777.04(4)(c), Fla. Stat. (2009). Because Antoine committed the offense with a firearm, his crime was reclassified to a first degree felony, punishable by 30 years imprisonment. See §§ 775.082(3)(b), 775.087(l)(b), Fla. Stat. (2009). Furthermore, since Antoine caused great bodily injury by using the firearm, the trial court was empowered to sentence him to a mandatory minimum anywhere between 25 years to life. See § 775.087(2)(a)3., Fla. Stat. (2009).' However, once the mandatory minimum was set at 25 years, Antoine’s highest potential sentence became capped at 30 years. Accordingly, Antoine’s sentence of 40 years imprisonment with a 25 year minimum mandatory was illegal.

Affirmed in part, and reversed and remanded for a new trial.

DAMOORGIAN, C.J., and KLINGENSMITH, J., concur.

. Because we are remanding for a new trial, it is not necessary to discuss the problem that arose when, without notice to the defense, a State expert witness significantly changed an important opinion after the prosecutor permitted the expert to physically examine the victim the same morning the expert testified.

. Slade did not raise the attorney-client privilege.

. In his grand jury testimony, Antoine testified that Hammond stated, “I'm going to fucking kill you now, you think I’m joking.”

. The defense objected to this opinion as a discovery violation and it was the subject of a hearing pursuant to Richardson v. State, 246 So.2d 771 (Fla.1971). In light of the retrial ordered on other grounds, we do not evaluate the trial court’s ruling on this issue.

. Again, Slade did not interpose the attorney-client privilege, probably because he agreed to have his conversations with his attorney recorded by the police.

. It should be noted that the First District has recently certified conflict with our decision in Wiley. See Kelly v. State, 137 So.3d 2, 39 Fla. L. Weekly D570 (Fla. 1st DCA Mar. 14, 2014).