FIRST DISTRICT COURT OF APPEAL
STATE OF FLORIDA

_____

No. 1D17-1347

_____

ANTONIO DEVON WILLIAMS,

Appellant,

v.

STATE OF FLORIDA,

Appellee.

_____

On appeal from the Circuit Court for Escambia County.
John L. Miller, Judge.

June 8, 2018

JAY, J.

In this direct criminal appeal, Appellant—Antonio Devon Williams—appeals his judgment of conviction and sentence for attempted second-degree murder. In its special interrogatory verdict, the jury found that during the offense Appellant possessed and discharged a firearm, causing great bodily harm. In his sole point on appeal, Appellant argues the trial court erred in denying his motion for judgment of acquittal because the State's evidence was legally insufficient to prove he acted out of ill will, hatred, spite, or evil intent. We disagree and affirm.

I.

The testimony and evidence presented by the State revealed that Appellant and Javier Chandler had been childhood friends

and, on the day of the offense, were still neighbors. Chandler, who was twenty-six years old at the time of the trial, testified that Appellant, a few years' Chandler's junior, had been like a little brother to him growing up. As they grew older they grew apart, yet remained on speaking terms, especially on those occasions when Appellant desired to purchase a firearm.

February 22, 2016, was just such an occasion. Chandler left work mid-afternoon to begin "calling around" to locate the gun Appellant wanted. After making several calls, he was successful in locating a seller and purchased a gun for Appellant. He claimed he did not have Appellant accompany him because he wanted to negotiate a price with the seller that would allow him to make a small profit when he asked Appellant for the cash. After the purchase, Appellant asked Chandler to drive him to Walmart so that he could buy bullets for his new "strap." According to Chandler, the two went into Walmart, but Chandler exited the store a short time later to finish smoking some marijuana.

After they left Walmart, the conversation turned to the price of the gun. Chandler revealed to Appellant that he had hoped to turn a profit of $50 for negotiating the purchase. It appeared to Chandler, however, that Appellant was trying to back out of the deal, which frustrated Chandler because he had taken time off from work to help Appellant locate the firearm.

When they pulled into Appellant's driveway, Chandler said that Appellant exited the car and walked in front of the vehicle, brandishing a pistol different from the one Chandler had procured. Chandler indicated that his driver's side door was "cracked" and his window was down. Chandler could not believe that Appellant would try to shoot him in broad daylight within earshot of the neighbors. Yet, Appellant demanded to know where his new gun was and accused Chandler of having taken the weapon. Chandler tried to persuade Appellant to "change his mind," but the next thing he knew, he "woke up" still in his car with the door "wide open," but across the street from Appellant's house.

Chandler ran to his grandmother's house—which was one or two doors down—and knocked on the door. His last memory was seeing his grandmother, who testified that when she opened the door, Chandler collapsed, bleeding profusely. Later, Chandler

2

would recall having seen Appellant standing in his driveway across the street, watching him as he was running toward his grandmother's house. Appellant was still holding the gun he had just used to shoot Chandler. Chandler's grandmother also saw Appellant watching from across the street while holding something that looked like "a stick." She later learned it was a gun.

Investigator Jimmie Tatum with the Escambia County Sheriff's Office responded to the shooting. He was directed to Appellant's house and spoke to Appellant's mother. Appellant was not present and his mother did not know where he was, but she permitted Investigator Tatum—and the deputies who had accompanied him—to conduct a protective sweep of her home. From the number of firearms and ammunition he observed in plain view in Appellant's bedroom, Investigator Tatum was able to obtain a search warrant for the house, as well as one for Chandler's car. No weapons or contraband were found in the car. After a be-on-the-lookout ("BOLO") for Appellant was dispatched and he was featured on the news and on "social media," Appellant turned himself in to the sheriff's office. There, he was interviewed by Investigator Tatum, and the recorded interview was played for the jury during the State's case-in-chief.

During the interview, Appellant's version of events proved to differ somewhat from Chandler's subsequent statement to Investigator Tatum and his trial testimony. Appellant's story included his active participation in the purchase of the gun from the seller. He admitted to Investigator Tatum that when he left to buy the gun with Chandler, he armed himself with another gun "to make sure . . . nothing happened or anything." He then set off with Chandler. At the seller's home, Appellant took the gun outside and fired some rounds to assure the gun was operable.

Afterwards, he and Chandler drove to Walmart for the bullets. Before he went inside the store, however, Appellant placed his newly purchased "strap" in his book bag, which also held his other gun. The two then entered the store, but immediately split up. Appellant walked to the back of the store where the ammunition was sold, while Chandler went off to purchase something for his girlfriend. Because there was an issue regarding the correct size of the bullets needed for the gun, Appellant found Chandler and the

3

two walked back outside to Chandler's car to look at the gun. According to Appellant, when they got back to the car, Appellant looked in his book bag and discovered the new gun was missing, although his other gun was still in the bag. Appellant suspected that while they were separated, Chandler had returned to the car and taken the gun. Appellant told Chandler to drive him home.

Appellant informed Investigator Tatum that when the two men arrived at Appellant's house, they got out of the car and began looking for the gun. At this point, according to Appellant, Chandler got "feisty." Appellant claimed he told Chandler that he did not want to fight with him; he just wanted Chandler to give him his gun. Chandler got back in the car and tried to pull away, but Appellant walked up to Chandler's partially opened door. He claimed Chandler knew all along that Appellant was armed. While Appellant was standing at Chandler's driver's side door, Chandler began "fidgeting like he was going for his pocket," and Appellant thought he was going to use Appellant's "strap" to shoot him. He told Investigator Tatum that he thought Chandler was "on something" like "some type of drugs."

He then explained that, although he did not see Chandler holding a gun, his "adrenaline took over" and he "hurr[ied] up and fired." Appellant thought he had missed Chandler altogether, but then he noticed "it [was] kind of oozing a little bit on the side of his neck[.]" Appellant watched as Chandler's car rolled backwards and he saw Chandler jump out and run to his grandmother's house with "something" in his hand. That "something" later turned out to be Chandler's cell phone. Appellant informed Investigator Tatum that he did not call the police because he was afraid the gun he had just purchased—which he believed was on Chandler's person at that time—was "hot" and he did not want to get into trouble. He claimed he did not mean to shoot Chandler because, had he intended to do so, he could have "busted the whole clip" on him.

Appellant related that he next turned and entered his house to get another weapon, fearing that Chandler and his "people" might return to "shoot up" his mother's house. At that point, Investigator Tatum wondered aloud why, when Appellant believed Chandler had taken his gun and he "knew sh*t was fixing to get

4

crazy," he just did not say "f**k it and walk away," forgetting about the money. Appellant explained that he did not want to "take another loss": his dirt bike was "messed up"; his PlayStation was broken; and someone had stolen his dirt bike a year ago. He complained that he had let too many things "slide," and he was "thinking about the money."

After the State rested, defense counsel moved for a judgment of acquittal, arguing the State had not proved the elements of second-degree murder, namely that "the act was imminently dangerous to another in demonstrating a depraved mind without regard to human life." He urged that there had to be "some evidence where a jury could find that the defendant's actions were more deliberate than impulsive," distinguishing the facts of the instant case from those in *Perez v. State*, 187 So. 3d 1279 (Fla. 1st DCA 2016), while relying on the analysis in *Rayl v. State*, 765 So. 2d 917 (Fla. 2d DCA 2000).

Taking the evidence in a light most favorable to the State, the trial court highlighted the facts establishing that the two men had been arguing about the price of the gun; Appellant walked around to the driver's side of the car with his gun drawn; Appellant did not want to "take another loss"; and Appellant was angry, believing that Chandler had taken his newly purchased gun. The court also considered Appellant's actions after the shooting, such as his failure to render aid to his "lifetime friend" and his flight from home when he did not "resurface for another 24 hours." The trial court concluded there was sufficient evidence to present the case to the jury.

## II.

We review the denial of a motion for judgment of acquittal de novo. *Pagan v. State*, 830 So. 2d 792, 803 (Fla. 2002) (citation omitted). And, as did the trial court, we "must consider the evidence and all reasonable inferences from the evidence in a light most favorable to the state." *Jones v. State*, 790 So. 2d 1194, 1197 (Fla. 1st DCA 2001) (en banc). "If, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt, sufficient evidence exists to sustain a conviction." *Pagan*, 830 So. 2d at 803; *see also Perez*, 187 So. 3d at 1281 ("If the

5

evidence, when considered in the light most favorable to the State, is capable of supporting a guilty verdict, a motion for judgment of acquittal must be denied.").

"Second-degree murder is '[t]he unlawful killing of a human being, when perpetrated by any act imminently dangerous to another and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual.'" *Perez*, 187 So. 3d at 1281-82 (quoting § 782.04(2), Fla. Stat.) "The depraved-mind element of second-degree murder requires 'ill will, hatred, spite, or an evil intent.'" *Id.* at 1282 (quoting *Poole v. State*, 30 So. 3d 696, 698 (Fla. 2d DCA 2010)). Typically, the requisite intent can be inferred from the circumstances of the case. *Id.* (citing *Antoine v. State*, 138 So. 3d 1064, 1074 (Fla. 4th DCA 2014)). But, "[t]o establish that the defendant acted with a depraved mind, the State must present evidence of circumstances showing more than an 'impulsive overreaction' to an attack." *Id.* (citing *Wiley v. State*, 60 So. 3d 588, 591 (Fla. 4th DCA 2011); *Dorsey v. State*, 74 So. 3d 521, 522 (Fla. 4th DCA 2011)).

In the present case, Appellant asserts that even when taken in a light most favorable to the State, the evidence proved only that his act of shooting Chandler was an "impulsive overreaction" to Chandler's "fidgety" behavior and did not rise to the level of the necessary ill will, hatred, spite, or evil intent needed to prove the charged offense of attempted second-degree murder. Appellant distinguishes the circumstances of the instant case from those in *Perez*, and, instead, compares them favorably to the facts related in *Poole v. State*, 30 So. 3d 696 (Fla. 2d DCA 2010), *Bellamy v. State*, 977 So. 2d 682 (Fla. 2d DCA 2008), *Rayl*, and *McDaniel v. State*, 620 So. 2d 1308 (Fla. 4th DCA 1993).

Because the facts in *Perez* are so similar to those in the instant case, they bear quoting here:

> [Perez] and Coley were approximately nineteen and twenty years old, respectively, at the time of the shooting. They lived in the same neighborhood and had been good friends in middle school. At some point, for a reason not revealed at trial, a rift developed in their relationship. They would still interact in a civil manner for

6

neighborhood basketball games, but their differences remained unresolved.

On the evening of the shooting, Coley and a friend were walking along a street when [Perez] approached them from behind on a bicycle. [Perez] and Coley exchanged words and ended up arguing face-to-face. [Perez] and Coley yelled at one another, but neither pushed, shoved, kicked, or punched the other. During the heated verbal exchange, Coley walked toward [Perez], challenging him to a physical fight. Coley testified that he asked [Perez] for a "fair fight," one-on-one, to finally settle their differences. [Perez] stated that he "wasn't taking no losses," and as Coley walked toward [Perez] in pursuit of a fight, [Perez] pulled out a gun and put it in Coley's face.

Surprised and angry, Coley pushed the gun away and continued moving towards [Perez], asking if [Perez] was seriously pulling a gun on him. From an arm's length away, [Perez] put the gun on Coley's stomach, and it "went off." Coley called [Perez's] name and said, "[Y]ou shot me." [Perez] answered, "I know. I should have killed you." As Coley's friend scrambled away from the scene, [Perez] pointed the gun at him. The friend hid behind an electrical box, and both Coley and the friend heard a couple more gunshots shortly after the first one. [Perez] then left on his bicycle.

*Perez*, 187 So. 3d at 1281.

Perez claimed that the shooting was merely an "impulsive overreaction" to Coley's invitation to fight, relying on *Poole*, *Bellamy*, *Rayl*, and *McDaniel*, for support. We noted that in those four cases, the appellate courts concluded the evidence was insufficient to establish the intent element of second-degree murder (or attempted second-degree murder), "where the defendants reacted to either an attack or a perceived imminent attack or were engaged in mutual physical fighting with the victims." *Id.* at 1282.

7

For instance, in *Poole* the defendant stabbed an unarmed victim when the victim angrily lunged at him inside a cramped recreational vehicle, where the victim was stronger and larger than the defendant and had a reputation for violence, particularly when he had been drinking, as he had been on the night in question. *Poole*, 30 So. 3d at 697-98. The facts in *Bellamy* showed that the defendant stabbed one victim when he was outnumbered and pushed against a wall, then stabbed another victim after being pushed to the ground by a crowd of brawlers. *Bellamy*, 977 So. 2d at 684. In *Rayl*, the defendant shot the victim twice after the victim "bust[ed] open" the door to his place of business and confronted him while threatening to kill him (after having made that same threat throughout the day), was allegedly armed, and was possibly lunging at the defendant following the first shot. *Rayl*, 765 So. 2d at 919-20. Lastly, in *McDaniel*, the defendant stabbed his son after the son hit the defendant in the mouth and knocked him to the ground. *McDaniel*, 620 So. 2d at 1308. As we emphasized in *Perez*: "These cases essentially involved imperfect self-defense claims." *Perez*, 187 So. 3d at 1282 (citing *Dorsey*, 74 So. 3d at 524). In other words, the defendant's behavior in each case could only be characterized as an overreaction to the show of threatening force; it did not evince ill will, hatred, spite, or an evil intent.

Likewise, in *Dorsey*, the Fourth District noted that "'[a]lthough exceptions exist, the crime of second-degree murder is normally committed by a person who knows the victim and has had time to develop a level of enmity toward the victim.'" *Dorsey*, 74 So. 3d at 524 (quoting *Light v. State*, 841 So. 2d 623, 626 (Fla. 2d DCA 2003)). The Fourth District further observed that, "'[h]atred, spite, evil intent, or ill will usually require more than an instant to develop.'" *Id.* (quoting *Light*, 841 So. 2d at 626). Thus, it held in *Dorsey* that the evidence was insufficient to sustain the conviction for second-degree murder where it was uncontested that the defendant was backed up to a car when he was confronted by a small crowd of men, including the heavily-intoxicated victims, heated words were exchanged, one of the victims punched the defendant in the face, and appellant pulled out his gun and shot both victims at close range. The victims died due to their wounds. The Fourth District explained its ruling:

Although a jury could reasonably find that the defendant's use of a gun was excessive, thereby negating a finding of self-defense, no evidence was presented that the defendant acted out of ill will, hatred, spite, or an evil intent. Furthermore, we reject the State's argument that the defendant's demeanor before the confrontation was sufficient to prove beyond a reasonable doubt that he acted with a depraved mind. The defendant's use of deadly force occurred only after he was attacked, and the State has pointed to no record evidence that the defendant had any previous grudge against these victims or any ongoing disputes between them.

*Id.* at 525.

But in *Perez*, we distinguished the foregoing decisions on the basis that even though Coley had challenged Perez to a fight and advanced toward him, the evidence did not "necessarily establish that when [Perez] shot Coley he was 'impulsively acting out of fear to save himself.'" *Perez*, 187 So. 2d at 1282 (comparing *Antoine*, 138 So. 3d at 1074 (distinguishing "impulsive overreaction" cases from those in which the evidence implied that the defendant was not "impulsively acting out of fear to save himself" but was "administering street justice")). We further held that while "the evidence showed the shooting was a response, and indeed an overreaction to Coley's challenge to fight," *id.*, there was testimony that "provided a basis from which the jury could find that [Perez's] reaction was more deliberate than impulsive." *Id.* This Court also relied on Perez's statement that he "should have killed" the victim in order to distinguish the case from the "impulsive overreaction" decisions.

Here, although there is no direct statement by Appellant that he "should have killed" Chandler, we nonetheless consider the facts to be on par with those in *Perez*, and distinguishable from those in *Dorsey, Poole*, *Bellamy*, *Rayl*, and *McDaniel*. Appellant and Chandler had been childhood friends, but there was no evidence that they had remained close friends once they reached adulthood. It would appear, though, that they remained cordial enough for Appellant to rely on Chandler to locate guns for him to purchase. That latter facet of their relationship—more so than the

daily civil rapport they might have shared—serves to explain the heightened tension that arose between them on February 22, 2016. Significantly, the gun in question was never found. But, as far as Appellant's having known Chandler long enough to develop enmity against him—the factor discussed in *Dorsey*—we conclude there was adequate evidence to satisfy that consideration.

In this case, the evidence—taken in a light most favorable to the State—showed that Appellant decided ahead of time to arm himself because, in his experience, any good will behind firearm deals could easily dissolve into distrust, or worse. From this it is reasonable to assume that Appellant was suspicious and primed for a fight even before he left with Chandler. Next, once at Walmart, when Appellant claimed he noticed the gun he had allegedly purchased was missing from his book bag, his suspicion caused him to assume that Chandler was the culprit. Chandler testified that once they returned to Appellant's house, Appellant became increasingly hostile. At that point, the jury could have found that Appellant bore a distinct grudge against Chandler. That grudge, or sense of "enmity," intensified once a search of Chandler's car did not produce the gun.

In addition, Appellant admitted to Investigator Tatum that he had been upset over the earlier theft of his dirt bike and that he had not wanted to suffer anymore "losses"—words very similar to those spoken by Perez. Thus, the most reasonable view of the evidence taken in a light favorable to the State, establishes that when Appellant walked around to the driver's side of the car and shot Chandler, sufficient ill will, hatred, spite, or evil intent had already taken root in Appellant's mind.

## III.

Accordingly, we conclude, as did the trial court, that the evidence was capable of supporting a guilty verdict for attempted second-degree murder. *Perez*, 187 So. 3d at 1281. As a result, we find the trial court properly denied Appellant's motion for judgment of acquittal.

AFFIRMED.

LEWIS and ROBERTS, JJ., concur.

10

_____

*Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.*

_____


Andy Thomas, Public Defender, and Kathleen Stover, Assistant Public Defender, Tallahassee, for Appellant.

Pamela Jo Bondi, Attorney General, and Heather Flanagan Ross, Assistant Attorney General, Tallahassee, for Appellee.