# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D18-1224
_____

AMOS MOORER,

    Appellant,

    v.

STATE OF FLORIDA,

    Appellee.

_____

On appeal from the Circuit Court for Leon County.
James C. Hankinson, Judge.

July 23, 2019

LEWIS, J.

Appellant, Amos Moorer, challenges his convictions for attempted second-degree murder and raises two issues pertaining to the jury instructions given at his trial. Appellant argues that the justifiable use of deadly force instruction was fundamentally erroneous because it included the "otherwise engaged in criminal activity" language, but no instruction on the alleged criminal activity. He further asserts that the trial court erred by giving the aggressor instruction over his objection. For the reasons that follow, we affirm.

## BACKGROUND

Appellant was charged with two counts of attempted first-degree murder after he shot Sara Renee Wilson, his ex-girlfriend, and Jahmai Makonnan Bassett, her boyfriend at the time. At trial, Wilson testified that she and Appellant broke up in the spring of 2016. They stayed in touch over the summer and he visited her at her new Tallahassee apartment. Prior to the incident, they last saw each other on July 4th, when Wilson ended their relationship for good and Appellant said "he was going to put himself out of his misery." Between the July 4th break-up and the August 11th incident, Appellant tried to contact Wilson from random phone numbers because she had blocked his number and would plead for her to get back together with him, but she did not call him, invite him over, or share with him anything about her life.

On August 11th, before it got dark, Wilson took her dog for a walk, and the dog alerted to the bushes next to her apartment building. In the bushes, Wilson saw Appellant laying on his stomach on the ground. Upon emerging from the bushes, Appellant asked Wilson to take the dog home and talk to him. She said she would, but only "to get away from him." Wilson was scared and observed that Appellant "was like he wasn't there," "it was like a person [she has] never seen. Like the look in his eyes was different. Like [she has] never seen him like that before." Wilson did not know that Appellant was coming over, and she did not say anything to him about her "weed man" being there.

Once inside her apartment, Wilson told Bassett that her ex-boyfriend was in the bushes and then called her sister. Wilson assumed Appellant left because she did not see him or his car when she looked out the window. Bassett stepped outside to wait for the Uber he had already requested because the drivers tended to go to the wrong location. Bassett had never met Appellant, did not know his name or what he looked like, and was not upset about his presence. While Bassett was outside waiting for his ride, Wilson was standing in her doorway. At that point, Appellant pulled up in his car right in front of them. Wilson asked Appellant to leave, but he exited his car and started shooting. Appellant first shot at Bassett and then came after Wilson. Once Bassett ran off to Wilson's right, Appellant "started running towards . . . [Wilson]

2

and [she] heard [more] gunshots." Appellant was facing and looking at Wilson as the gunshots continued and he made it all the way to her doorway. When Appellant saw Wilson was shot, he "just took off running."

Wilson knows Appellant owns a .45 gun, whereas Bassett does not own a gun and did not have one with him on the day of the incident. Wilson did not see Bassett do anything with his pants or waistband, but she could not see everything clearly because of the stairwell. When asked if she heard Bassett yell, curse, or make threats, Wilson explained, "I heard him say the same thing I said, just leave, she asked you to leave"; "he said something along the lines of the same thing I said. He asked, please - - she asked you to please leave." Wilson hung up with her sister to call 911, the recording of which was admitted into evidence and reflected that she told the dispatcher, "[Appellant] just came up here and I opened the door and he just started shooting at me." Bassett was upset with Wilson after the incident and did not want anything to do with her.

Several witnesses corroborated Wilson's account of the incident. Shannon Walsh, Wilson's sister, testified that shortly before 8:00 p.m. on August 11th, she received a phone call from Wilson, who sounded "worried, scared." While they were on the phone, Walsh heard Wilson repeatedly say, "please leave, [Appellant]; we've asked you to leave." Walsh also heard Bassett talking and observed that he was not yelling. "Literally right after" Wilson asked Appellant to leave, Walsh heard gunshots and screaming. The recording of Walsh's 911 call was admitted into evidence and reflected that she reported that Appellant "showed up at [Wilson's] house in the bushes," he had been stalking Wilson for a while, Wilson politely asked him to leave and told him she did not want to talk to him and he was "freaking [her] out," "and that's when he just shot."

Michael Wilson, a resident at Wilson's apartment complex and of no relation to her, testified that he saw Appellant stand up in between two vehicles, "bolt[] out in front of the vehicles," and "[stick] his arm out like this and start[] firing" at Bassett, who was in the doorway area of the apartment and then ran to his right before falling to the ground. Appellant looked around and then

3

said to Wilson, who had been standing in her doorway and was entering her apartment, "where do you think you're going" and followed her. Michael heard gunshots as Appellant bolted from between the vehicles, after Bassett ran, and as Appellant was going towards Wilson.

Neither the resident who assisted Bassett at the scene nor the forensic specialist who collected Bassett's belongings at the hospital saw a gun on him. Wilson and Bassett were shot multiple times in the leg and foot. Five spent casings and three projectiles were collected at the crime scene, which an expert in ballistics testified were fired from a Hi-Point .45 caliber semiautomatic pistol. Sergeant Christopher Corbitt, an expert in historical communication records analysis, testified that based on Appellant's phone records, he determined that on the day in question, Appellant entered Leon County about 6:14 p.m., was around the crime scene at 7:52 p.m., was moving away from the scene at 7:55 p.m., and was back in Jacksonville at 10:59 p.m.

Appellant testified that he had broken up with Wilson and they last spoke about ten days before the incident. On August 11th, Appellant was going to the Pensacola area for vacation and decided to stop at the leasing office of Wilson's apartment complex to see if he could obtain another lease for her because he knew her lease was about to expire and she was having issues with it. Appellant still loved Wilson, but was not intending on seeing her, so he parked and walked where she could not see him. When Appellant saw Wilson walking the dog, he squatted down in the bushes in an attempt to avoid her, though he was not trying to hide. When the dog alerted Wilson to the bushes, Appellant stood up and she "kind of bust[ed] out laughing." Appellant asked to talk to Wilson for a minute, and she said, "give me a second, . . . my weed man is here." Appellant thought Wilson was referring to "Seven," with whom he did not want any contact because his understanding was that Seven was a gang member and she had his dog. Appellant had taken Wilson to Seven's house to buy marijuana, but never actually met him.

Appellant then went to his car to pull into the apartment complex because Wilson said "he was going to leave." When Appellant parked directly in front of Wilson's apartment, he saw

4

her in the doorway and a man walking away from the apartment. While Appellant was still in his car, the man—Bassett—turned around and headed towards him. Appellant explained, "[Bassett] just had a pissed off look on his face. He just looked angry. He was on his cell phone when he was walking towards me," "[a]nd at this point I'm only, you know, making assumptions." Appellant told Bassett that he did not have a problem with him and was there to talk to Wilson. Bassett had gold teeth and tattoos, which made Appellant think he was Seven. As Bassett was "still pacing back and forth on the sidewalk," he was "fumbling [in his pocket and then waistband] with what [Appellant] believe[d] to be a firearm." Believing that Bassett was armed, Appellant started looking for his firearm, a Hi-Point .45. Appellant asked Wilson to talk to him, but she said she could not and looked at Bassett, which made Appellant think that Bassett was holding her against her will. Appellant asked Bassett if they had a problem, to which Bassett responded, "I don't know, you tell me. . . [F]*** . . ., if you know something, you better get somewhere before you get your wig split." Appellant understood that statement to be a threat to cause him death or severe bodily harm, and he was very scared. Appellant drew his weapon because he believed Bassett was about to shoot him.

After Appellant fired the first shot at Bassett, Bassett continued to face Appellant and started backing up, and then he "turns and runs and he falls [on his back] left of Wilson's front door." At that point, Appellant saw that Bassett's hands were empty and he stopped firing because he was not trying to kill Bassett and felt he could leave. Appellant added, "Before I couldn't -- I felt like, like he just forced me out of the car; like I didn't have any other option." Once Bassett fell to the ground, Appellant "turned around and walked back to the car." Appellant never tried to shoot Wilson and was unaware that she was injured. Appellant returned to Jacksonville without calling the police because Wilson "is involved with some stuff" and he did not want her to get into trouble for it.

On cross-examination, Appellant testified that when he arrived at the apartment complex around 7:00 p.m. or so, he parked at a nearby restaurant and found the leasing office closed. After leaving the office, "[Appellant] kind of walked around the

apartment complex. [He] was like looking where [Wilson] was at." Appellant was outside of Wilson's apartment for twenty minutes or so watching if there were any men coming and going from her apartment. He explained, "When I got ready to come back, that's when I saw her coming toward me and I kind of basically tried to hide from her. I didn't want her to know I was there." Bassett initially did not say anything to or make any gestures toward Appellant and looked angry based on having tattoos, gold teeth, and dreads. When Bassett started to approach and make comments, Appellant did not roll up his window or drive away because he was worried about Wilson. Wilson had told Appellant that she was keeping Seven's dog because he was jailed "for a long time and he wasn't going to be getting out any time soon."

The defense called Roy Bedard as an expert in self-defense, and he testified that Appellant recounted features he commonly sees in cases of fear-based stress response. Bedard opined that Appellant felt his life was in imminent danger and that Appellant's actions were objectively reasonable and the use of deadly force in response to his perceived deadly threat was appropriate. On cross-examination, Bedard agreed that Appellant sounded very educated on the use of force.

On rebuttal, Corbitt testified that Appellant's phone records indicated his presence in the area of the apartment complex from 6:17 until 7:55 p.m.

The defense requested instruction on justifiable use of deadly force, and the jury was instructed in part as follows:

> [Appellant] was justified in using or threatening to use deadly force if he reasonably believed that such force or threat of force was necessary to prevent imminent death or great bodily harm to himself or another, or the imminent commission of a murder against him. If [Appellant] was not otherwise engaged in criminal activity and was in a place he had a right to be, then he had no duty to retreat and had the right to stand his ground.
>
> In deciding whether [Appellant] was justified in the use or threatened use of deadly force, you must consider

6

the circumstances . . . . However, the defendant had no duty to retreat if he was not otherwise engaged in criminal activity and was in a place where he had a right to be.

However, the use or threatened use of deadly force is not justified if you find that [Appellant] used force or the threat of force to initially provoke the use or threatened use of force against himself, unless: . . . .

Appellant objected only to the aggressor portion of the instruction.

During closing argument, the defense contended that Appellant acted in self-defense and that he had no duty to retreat because he was there lawfully and "did not go there that day with this set of facts to commit any crime whatsoever." In rebuttal, the State argued that only Appellant and his expert, who merely relied on what he told him, claimed that he acted in self-defense. The State discussed the reasons why Appellant should not be believed, addressing the weighing of credibility factors. The State also discussed the conflicts in Appellant's testimony and argued in part as follows:

[Appellant] says he was there for only about 20 or 25 minutes. . . . He was actually at the apartment complex from 6:15 to 7:55. . . . And it is not reasonable to believe that he was going to the apartment complex after hours to try to take over this lease . . . that [] doesn't end in three weeks for this girl that he hasn't talked to.

He was at the apartment complex, because he is stalking her and he wanted to see if she was with another man and he was obsessed with her and he couldn't leave it alone. And he waited out there for an hour and 40 minutes.

He says -- the defendant says that he and Ms. Wilson were talking up to this point. Up until 10 days before, everything is fine. Yet, if everything is fine between them . . ., why is he having to park at a nearby restaurant? . . .

7

And if everything is okay with her, . . . why did he hide in the bushes? . . .

In your self-defense instructions . . ., the last paragraph . . . says: If [Appellant] was not otherwise engaged in criminal activity and was in a place where he had a right to be, then he had no duty to retreat . . . .

What did we learn from Sergeant Corbitt? He was at this place for an hour and 40 minutes and he was hiding in the bushes. He is stalking her. Even if, let's say, his whole story about all of this is true, about everything Jahmai Bassett did with him, he is still not able to be there. He is otherwise engaged in criminal activity. He is stalking her.

The State then discussed the evidence that conflicted with Appellant's self-defense claim.

Appellant was convicted on each count of the lesser offense of attempted second-degree murder, and he was sentenced to concurrent terms of thirty years of imprisonment, with a minimum mandatory term of twenty years for the firearm. This appeal followed.

## ANALYSIS

### *"Otherwise engaged in criminal activity" instruction*

An unpreserved error in a jury instruction may be reviewed only for fundamental error. *Olivera v. State*, 58 So. 3d 352, 353 (Fla. 1st DCA 2011) (noting that jury instructions are subject to the contemporaneous objection rule). An issue of fundamental error is reviewed *de novo*, and an error is fundamental when it reaches down into the validity of the trial to the extent that a guilty verdict could not have been obtained without its assistance. *Elliot v. State*, 49 So. 3d 269, 270 (Fla. 1st DCA 2010). In determining whether a jury instruction constitutes fundamental error, we must consider the effect of the erroneous instruction in the context of the remaining instructions, the evidence adduced, and counsel's arguments and trial strategies. *Hardison v. State*, 138 So. 3d 1130, 1132 (Fla. 1st DCA 2014); *see also Hunter v. State*, 8 So. 3d 1052,

1070 (Fla. 2008) (considering the totality of the circumstances in determining whether the unpreserved error in the jury instructions was fundamental). "[T]he fundamental error doctrine 'should be applied only in rare cases where a jurisdictional error appears or where the interests of justice present a *compelling demand* for its application.'" *Martinez v. State*, 981 So. 2d 449, 455 (Fla. 2008) (citation omitted).

A jury instruction involving an affirmative defense, instead of an element of the crime, is fundamentally erroneous only where it is so flawed as to deprive the defendant of a fair trial. *Id.* at 455-57. A defendant is deprived of a fair trial if the error in the jury instruction divests him of his sole or primary defense strategy and the defense is supported by trial evidence that cannot be characterized as weak. *Id.* (finding that the error in the forcible felony instruction was not fundamental for two reasons: self-defense was not the defendant's only strategy, and his self-defense claim was extremely weak); *see also Hall v. State*, 260 So. 3d 1152, 1153 (Fla. 1st DCA 2018) (explaining the same and concluding that the failure to instruct the jury on the parental-discipline affirmative defense did not constitute fundamental error because "although Appellant's sole defense was that the child's injuries occurred while Appellant was disciplining him, that defense was extremely weak because there was no evidence that the child committed any misbehavior that would arguably justify discipline. Rather, the undisputed evidence showed that the child was given a whipping for trying to prevent Appellant from hitting his mother in the car."); *Day v. State*, 119 So. 3d 485, 486-90 (Fla. 1st DCA 2013) (finding that the trial court did not fundamentally err in failing to give the prescription defense despite it being the appellant's sole theory of defense because "[i]n contrast to our prior opinions on this issue, Appellant's defense was supported by evidence that can only be characterized as weak and the prosecutor did not make an egregiously, incorrect argument regarding this defense").

The justifiable use of deadly force instruction that was given in this case was the standard instruction in effect when Appellant's crimes were committed in 2016 and it contained the "otherwise engaged in criminal activity" language and no direction for the

9

trial court to define the alleged criminal activity.* *See* Fla. Std. Jury Instr. (Crim.) 3.6(f); *see also* § 776.012(2), Fla. Stat. (2016) ("A

---

\* In 2018, the standard jury instruction on justifiable use of deadly force was amended, whereby the underlined portions were added:

*Give if applicable. §§ 776.012(2), 776.031(2), Fla. Stat. Defendant not in a dwelling or residence or defendant was in a dwelling or residence but had no right to be there. Where appropriate, the court should state or define the applicable criminal activity that the defendant may have been engaged in.*

(Defendant) was justified in [using] [or] [threatening to use] deadly force if [he] [she] reasonably believed that such [force] [or] [threat of force] was necessary to prevent [imminent death or great bodily harm to [himself] [herself] [or] [another] [or] [the imminent commission of (applicable forcible felony listed in § 776.08, Fla. Stat.) against [himself] [herself] [or another]]. If (defendant) was not otherwise engaged in criminal activity and was in a place [he] [she] had a right to be, then [he] [she] had no duty to retreat and had the right to stand [his] [her] ground.

. . . .

*Give the paragraph below when there is evidence that the defendant was engaged in criminal activity or was not in a place where he or she had a right to be, which means there was a duty to retreat. Morgan v. State, 127 So. 3d 708 (Fla. 5th DCA 2013). Where appropriate, the court should state or define the applicable criminal activity that the defendant may have been engaged in.*

If (defendant) was otherwise engaged in criminal activity or was not in a place [he] [she] had a right to be, then the [use] [or] [threatened use] of deadly force was not justified unless [he] [she] used every reasonable means within [his] [her] power and consistent with [his] [her] own

10

person who uses or threatens to use deadly force in accordance with this subsection does not have a duty to retreat and has the right to stand his or her ground if the person using or threatening to use the deadly force is not engaged in a criminal activity and is in a place where he or she has a right to be.").

Appellant's first argument on appeal is that the justifiable use of deadly force instruction was fundamentally erroneous because it included the "otherwise engaged in criminal activity" language, but the jury was not instructed on the alleged criminal activity of stalking. Appellant properly concedes that the alleged error was not preserved. Appellant's sole theory of defense was self-defense,

---

safety to avoid the danger before resorting to the [use] [or] [threatened use] of deadly force. . . .

. . . .

*If the evidence is in dispute about whether the defendant was in a dwelling or residence or whether the defendant had a right to be there or whether the defendant was engaged in criminal activity, the trial judge must craft a special instruction for the paragraph below.*

In deciding whether (defendant) was justified in the [use] [or] [threatened use] of deadly force, you must consider the circumstances by which [he] [she] was surrounded at the time the [force] [or] [threat of force] was used. . . . However, the defendant had no duty to retreat if [he] [she] was [not otherwise engaged in criminal activity and was in a place where [he] [she] had a right to be] [was in a dwelling or residence in which [he] [she] had a right to be].

Fla. Std. Jury Instr. (Crim.) 3.6(f). The amended instruction is to be given "for crimes committed on or after July 1, 2017." *Id.*; *see also In re Standard Jury Instructions in Criminal Cases-Report 2017-07*, 257 So. 3d 908 (Fla. 2018). The amended instruction did not apply in this case because the crimes were committed in 2016.

11

but the evidence supporting that defense was weak. Appellant provided testimony that was both internally inconsistent and contradicted by the testimony of witnesses. For example, Appellant testified on direct examination that he was not trying to hide from Wilson, he thought Bassett was Seven, and he could not initially leave because he felt like Bassett forced him out of the car and he had no other option. By contrast, Appellant testified on cross-examination that he was trying to hide from Wilson, she had told him that Seven was in jail for a long time, and he did not initially leave because he was worried about Wilson. Appellant also claimed that Bassett approached him and threatened him, whereas Wilson testified that Bassett simply asked him to leave, and both Wilson and Walsh testified that Appellant started shooting after Wilson asked him to leave. Appellant further asserted that he walked back to his car once Bassett fell and did not try to shoot Wilson, but Wilson and Michael testified that after shooting Bassett, Appellant advanced towards Wilson while shooting at her. The only other witness Appellant presented was Bedard, the self-defense expert, whose testimony was primarily based on what Appellant had told him.

Furthermore, although the State argued that Appellant was engaged in the criminal activity of stalking, it did so only in rebuttal to the defense's argument that Appellant had no duty to retreat; it did not misstate the law on self-defense or on the crime of stalking, much less make an egregiously incorrect argument about self-defense; and its primary argument was that Appellant's self-defense claim should be rejected because his testimony was not credible and his claim was refuted by the evidence. As noted above, the self-defense instruction the trial court gave was the standard instruction in effect when Appellant's crimes were committed. *See State v. Floyd*, 186 So. 3d 1013, 1022 (Fla. 2016) (noting that the standard jury instructions are presumed correct). Based on the foregoing, we conclude that the alleged error in the jury instruction does not rise to the level of fundamental error.

### *Aggressor instruction*

A trial court's decision to give or withhold a jury instruction is reviewed for an abuse of discretion. *Thompson v. State*, 257 So. 3d 573, 580 (Fla. 1st DCA 2018). The standard jury instruction on

justifiable use of deadly force contains the following aggressor instruction: "However, the [use] [or] [threatened use] of deadly force is not justified if you find that (defendant) used [force] [or] [the threat of force] to initially provoke the [use] [or] [threatened use] of force against [himself] [herself], unless: . . . ." Fla. Std. Jury Instr. (Crim.) 3.6(f); *see also* § 776.041, Fla. Stat. (2016) ("The justification described in the preceding sections of this chapter is not available to a person who . . . [i]nitially provokes the use or threatened use of force against himself or herself, unless . . . ."). "An initial aggressor instruction is proper when there is evidence in the record that the defendant may have initially provoked the use of force against himself." *Thompson*, 257 So. 3d at 581 (citing *Johnson v. State*, 65 So. 3d 1147 (Fla. 3d DCA 2011)); *see also* Fla. Std. Jury Instr. (Crim.) 3.6(f) (stating that the aggressor instruction is to be given "if applicable").

Appellant's second claim of error on appeal is that the trial court erred by giving the aggressor instruction over his objection because it was not supported by the evidence. In so arguing, Appellant relies exclusively on his testimony, ignoring the conflicts in the evidence. For instance, while Appellant claimed that Bassett looked angry and approached him as he was making a threat, Wilson testified that Bassett was not upset about his presence and they both asked him to leave. Walsh similarly testified that she could hear Bassett talking and he was not yelling and that she heard gunshots "literally right after" Wilson asked Appellant to leave. Appellant further testified that when Bassett fell to the ground, he ceased firing and returned to his car, but Wilson and Michael both testified that he continued to shoot and went after Wilson. Thus, the trial court did not err by giving the aggressor instruction because there was record evidence that Appellant may have initially provoked the use of force.

Accordingly, we affirm Appellant's convictions.

AFFIRMED.

OSTERHAUS and M.K. THOMAS, JJ., concur.

13

_____

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

_____


Andy Thomas, Public Defender, and M. J. Lord, Assistant Public Defender, Tallahassee, for Appellant.

Ashley Moody, Attorney General, and Benjamin L. Hoffman, Assistant Attorney General, Tallahassee, for Appellee.