# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D17-2012
_____

ORANDO RICARDO THOMPSON,

Appellant,

v.

STATE OF FLORIDA,

Appellee.

_____

On appeal from the Circuit Court for Bay County.
Michael C. Overstreet, Judge.

October 15, 2018


ROWE, J.

Orando Ricardo Thompson challenges his conviction for second-degree murder and his sentence of life imprisonment. We affirm, but write to address three of his arguments on appeal.

*Facts*

In the summer of 2015, tempers started to simmer when Caleb Halley, a long-time employee of Buddy's Seafood Market, learned that Orando Thompson, a newer employee, added hot sauce and other seasonings to the gumbo Halley prepared earlier that day. Halley confronted Thompson about adding seasoning to the gumbo, and the argument escalated to a physical altercation outside of the market. At one point, Thompson left the fight,

reentered the market, retrieved a sword on display in a backroom of the market, and returned outside to stab Halley three times in the abdomen. These wounds ultimately led to Halley's death.

Before trial, Thompson moved to dismiss the charge, arguing that he was immune from prosecution pursuant to the Stand Your Ground Law. The trial court conducted an evidentiary hearing and denied the motion. Thompson challenged this denial via a writ of prohibition. This Court denied the petition without prejudice to Thompson's ability to raise the affirmative defense of self-defense at trial. *Thompson v. State*, 204 So. 3d 990, 991 (Fla. 1st DCA 2016).

The altercation between Halley and Thompson, which occurred directly behind the business, was recorded from two different angles by the surveillance equipment installed at Buddy's Seafood Market. Although the video has no sound, it depicts Halley approaching Thompson and the two beginning to argue. Thompson testified at trial that when Halley first approached him, Halley said, "[D]on't touch my fucking gumbo again."

The physical altercation began with the two men puffing out their chests and pushing at each other. Halley appears to pull something from his pocket (Thompson later testified that it was a knife) and Thompson arms himself with a discarded piece of lumber. When Thompson dropped the piece of lumber, the two men resumed pushing each other. Thompson then armed himself with a discarded broom handle, and Halley picked up the piece of lumber Thompson had dropped. At this point, the men appear to be in an heated verbal exchange, and although armed, the men still only push each other with open palms.

After about ninety seconds, Thompson can be seen leaving the fight and going inside the market. Halley, under an apparent belief that the altercation was over, picked up his belongings and started walking towards his vehicle. A video from a different angle shows that when Thompson entered the market, he walked directly to the backroom and grabbed a sword that was displayed on the wall. The sword had a fifteen-inch blade.

After about twenty seconds, Thompson returned outside to confront Halley with the sword. Halley used the nearby broom handle to defend himself. The men continued to scuffle and swing their respective weapons at each other. Thompson can be seen making stabbing motions with the sword. The altercation continues until two employees exit the market and break up the fight. When the men were finally separated, a witness testified that Halley said, "He stabbed me, bro," and a portion of Halley's intestines was visibly protruding from one of his wounds.

Halley was taken to the hospital, but he died as a result of complications from the abdominal stab wounds. Halley suffered a total of three stab wounds. Two of the wounds were deep enough to penetrate the abdominal cavity.

When he was interviewed by the police after the stabbing, Thompson told Lt. Eusebio Talamantez, the lead investigator, that Halley pulled out a knife and threatened to cut him. He explained that he felt that he had to defend himself so he grabbed the sword from the backroom. When asked why he went back outside with the sword, Thompson explained it was because he was mad and upset with Halley.

At trial, during direct examination, Lt. Talamantez referred to some of the statements made by Thompson during the recorded interview as "inaccurate" and "not true." On cross-examination, defense counsel, in an attempt to challenge the thoroughness of the investigation, asked Lt. Talamantez about the proper method of investigating a self-defense case, and the lieutenant responded, "This case wasn't self-defense, it was the exact opposite of self-defense." Defense counsel did not object to this statement.

After the trial court denied Thompson's motion for judgment of acquittal, Thompson testified on his own behalf. He explained that he was authorized to spice the gumbo. Thompson testified that, in his capacity as an employee at Buddy's Seafood Market, he had known and worked with Halley for four or five years. While he characterized their relationship as good, Thompson also testified that Halley would often complain about the quality of Thompson's work. Thompson and several other employees testified that Halley was known to carry a small knife around his

3

neck that he used to open boxes. He explained that he went inside to get the sword because Halley was coming towards him with a board and he was scared.

At the charge conference, defense counsel asked the court to include an instruction on the justifiable use of non-deadly force. The State objected to the inclusion of the instruction, arguing that, under the facts of this case, there was no support for the assertion that the sword was used in a non-deadly manner. The trial court denied the request.

Defense counsel also asked the court to refrain from instructing the jury that the use of deadly force was not justified if Thompson initially provoked the use of force against himself because Halley was the initial aggressor. The State argued that Thompson provoked the use of force against himself when he left the fight, went inside the market to retrieve the sword, and returned outside to confront Halley. The trial court overruled the objection.

The jury found Thompson guilty of second-degree murder and he was sentenced to life imprisonment. This timely appeal follows.

*Analysis*

On appeal, Thompson raises three issues that merit discussion. First, he argues that fundamental error occurred or, in the alternative, trial counsel was ineffective when the lead investigator was permitted to comment on Thompson's credibility and testify that this was not a self-defense case. Second, Thompson contends that the trial court should have granted his motion for judgment of acquittal because the evidence showed no more than an impulsive overreaction to Halley's attack. Third, he asserts that the trial court erred in refusing to instruct the jury on the justifiable use of non-deadly force and erred in instructing the jury on the initial aggressor exception to the use of deadly force.

*Fundamental Error/Ineffective Assistance of Counsel*

Thompson argues that fundamental error occurred or, in the alternative, trial counsel was ineffective when the lead

4

investigator was allowed to testify that this was a self-defense case and to comment on Thompson's credibility. We review these arguments de novo. *Elliot v. State*, 49 So. 3d 269, 270 (Fla. 1st DCA 2010).

As a general rule, "a witness' opinion as to the credibility, guilt, or innocence of the accused is inadmissible." *Jackson v. State*, 107 So. 3d 328, 339 (Fla. 2012). "[I]t is especially troublesome when a jury is repeatedly exposed to an interrogating officer's opinion regarding the guilt or innocence of the accused." *Id.* at 340; *Martinez v. State*, 761 So. 2d 1074, 1080 (Fla. 2000) ("[T]here is an increased danger of prejudice when the investigating officer is allowed to express his or her opinion about the defendant's guilt."). Here, Lt. Talamantez repeatedly commented on Thompson's credibility by asserting that many of the statements made during Thompson's interview were inaccurate and untrue. Had defense counsel objected to any of Talamantez's above-mentioned statements, then the trial court would have been required to sustain the objection as they were impermissible comments on Thompson's guilt. *See Battle v. State*, 19 So. 3d 1045, 1048 (Fla. 4th DCA 2009) (noting that if defense counsel had properly objected to the detective's statement that he was certain that the defendant was the person that committed the burglary, then the trial court would have been required to exclude the testimony as impermissible opinion on the defendant's guilt).

Further, it is impermissible for an investigator to testify that a case does not involve self-defense. *Bartlett v. State*, 993 So. 2d 157 (Fla. 1st DCA 2008). In *Bartlett*, the investigating officer testified that he ruled out self-defense before signing a complaint for murder. *Id.* at 158. This Court held that this was impermissible testimony because the testimony improperly invaded the province of the jury and allowed the investigator to serve as a fact-finder by determining that self-defense was not a viable defense. *Id.* at 161. Here, Lt. Talamantez acted as a fact-finder by stating his personal conclusion that this case did not involve self-defense. Again, had defense counsel objected to this testimony, the trial court would have been required to sustain the objection.

5

But merely because the lead investigator's testimony was admitted in error does not mean that it rises to the level of fundamental error. Rarely will an error be deemed fundamental. *F.B. v. State*, 852 So. 2d 226, 229 (Fla. 2003). The supreme court has stated, "in order to be of such fundamental nature as to justify a reversal in the absence of timely objection the error must reach down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." *Id.* (quoting *Brown v. State,* 124 So. 2d 481, 484 (Fla. 1960)).

Under the specific facts of this case, the investigator's statements do not rise to the level of fundamental error. Rather, they are harmless because there is no reasonable possibility that these statements contributed to the jury's verdict. *See State v. DiGuilio*, 491 So. 2d 1129, 1135 (Fla. 1986). Here, the jury's guilty verdict would be easily attainable without the investigator's statements because the jury was able to watch a video of the altercation. Unlike most surveillance videos, this one was crisp, clear, and in color. The jury was able to view the altercation from two different angles and was able to watch Thompson leave the fight, enter the business to obtain the sword, and return to the fight. The video demonstrates that Thompson had multiple opportunities to end the altercation and he, instead, chose to reinitiate the fight with Halley.

In the alternative, Thompson argues that defense counsel's failure to object to the lieutenant's statements was ineffective assistance of counsel on the face of the record. "An appellate court initially reviewing a conviction will only grant relief for ineffective assistance of counsel where the ineffectiveness of counsel is apparent from the face of the record before the appellate court *and* a waste of judicial resources would result from remanding the matter to the lower court for further litigation." *Monroe v. State*, 191 So. 3d 395, 403 (Fla. 2016). To establish a claim of ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that he was actually prejudiced by the deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687-88, 691-92 (1984). "The benchmark for judging claims of ineffectiveness . . . is whether the conduct of counsel 'so undermined the proper functioning of the adversarial process that

6

the trial cannot be relied on as having produced a just result.'" *Cabrera v. State*, 766 So. 2d 1131, 1133 (Fla. 2d DCA 2000) (quoting *Downs v. State*, 453 So. 2d 1102, 1106 (Fla. 1984)).

Although defense counsel's performance was deficient because he should have objected to several portions of the investigator's testimony, Thompson cannot establish that he was prejudiced by the failure to object because the video of the altercation would still have been admissible. The jury was able to watch the entire altercation – from two different angles – when determining whether Thompson was guilty of second-degree murder. Thus, Thompson is unable to show that there is a reasonable probability that the outcome of his trial would have been different if defense counsel had objected to the investigator's testimony.

*Judgment of Acquittal*

Next, Thompson contends that the trial court should have granted his motion for judgment of acquittal because the evidence did not support a conviction for second-degree murder but showed no more than an impulsive overreaction to Halley's attack. We review this argument de novo. *Dunn v. State*, 206 So. 3d 802, 804 (Fla. 1st DCA 2016). The legal test for determining whether a judgment of acquittal should be granted is "whether after all conflicts in the evidence and all reasonable inferences therefrom have been resolved in favor of the verdict on appeal, there is substantial, competent evidence to support the verdict and judgment." *Tibbs v. State*, 397 So. 2d 1120, 1123 (Fla. 1981). Legal sufficiency alone, as opposed to evidentiary weight, is the sole concern of an appellate court. *Id.*

"In the context of second-degree murder, an act is imminently dangerous to another and evinces a 'depraved mind' if it is an act or series of acts that: (1) a person of ordinary judgment would know is reasonably certain to kill or do serious bodily injury to another; and (2) is done from ill will, hatred, spite or an evil intent; and (3) is of such a nature that the act itself indicates an indifference to human life." *Wiley v. State*, 60 So. 3d 588, 591 (Fla. 4th DCA 2011). However, an impulsive overreaction to an attack is insufficient to support a second-degree murder conviction. *Antoine v. State*, 138 So. 3d 1064, 1073 (Fla. 4th DCA 2014). This is so because "(a) a

7

defendant who at worst acts recklessly does not satisfy the 'depraved mind' element of the crime; and (b) conduct in the form of an immediate overreaction to an assault is generally insufficient to prove ill will, hatred, spite, or evil intent, as those mental states usually require more than an instant to develop." *Henry v. State*, 145 So. 3d 924, 927 (Fla. 4th DCA 2014).

Here, the evidence did not support a finding that Thompson's stabbing of Halley was an impulsive overreaction because Thompson had time to consider the nature of his act. *Antoine*, 138 So. 3d at 1073. The surveillance video shows that it took Thompson at least twenty seconds to leave the fight, go inside the market, retrieve the sword, and return outside to reinitiate the fight. Thompson admitted during his recorded interview that he went back outside because he was mad and upset. Thompson's use of the sword was clearly an "overreaction," but it was not "impulsive" as he had ample time to consider the ramifications of returning outside to reengage in the fight with Halley. The video shows that Halley made no attempt to pursue Thompson and that Halley had prepared to leave the fight by gathering his belongings. There was competent, substantial evidence from which the jury could, and did, conclude that Thompson acted with a deliberate disregard for human life; thus, the trial court properly denied the motion for judgment of acquittal.

*Jury Instructions*

Finally, Thompson asserts that the trial court erred in refusing to instruct the jury on the justifiable use of non-deadly force and also erred in instructing the jury on the initial aggressor exception to the use of deadly force. We review arguments concerning the giving or withholding of jury instructions for an abuse of discretion. *Kervin v. State*, 195 So. 3d 1181, 1182 (Fla. 1st DCA 2016).

When determining whether to give an instruction on deadly or non-deadly force, the trial court should focus on the nature of the force used, not on the weapon itself, because a deadly weapon can be used without deadly force. *Brown v. State*, 113 So. 3d 103, 104 (Fla. 5th DCA 2013). If the force used is clearly deadly or non-deadly as a matter of law, only the applicable jury instruction

should be given. *Larsen v. State*, 82 So. 3d 971, 974 (Fla. 5th DCA 2011). "Where the evidence at trial does not establish that the force used by the defendant was deadly or non-deadly as a matter of law, the question is a factual one to be decided by the jury, and the defendant is entitled to jury instructions on the justifiable use of both types of force." *Id.* (quoting *Cruz v. State*, 971 So. 2d 178, 182 (Fla. 5th DCA 2007)).

"Although Florida courts have clearly and consistently emphasized that the determination of whether a weapon is deadly is a question to be decided by a jury, this general rule is applicable only where the evidence of a particular case does not establish that the weapon used was deadly as a matter of law." *Id.* at 975. The act of "thrusting a knife into someone's chest cavity, home of many vital organs" has been found to be deadly force because it is likely to cause death or great bodily harm. *Id.* (citing *Waldo v. State*, 728 So. 2d 280, 281 (Fla. 3d DCA 1999)). The act of using a sharp knife to strike the victim's neck was determined to be deadly force as a matter of law. *Id.* In contrast, the act of making "a single slashing motion with a razor blade towards the victim's hand" was determined to be non-deadly force because death was not the natural, probable and foreseeable consequence of the defendant's action. *Id.* (citing *DeLuge v. State*, 710 So. 2d 83, 84 (Fla. 5th DCA 1998)).

Here, Thompson's use of a sword with a fifteen-inch blade was deadly force as a matter of law because death is a natural and foreseeable consequence of slashing and stabbing another person with a sword. *Brown*, 113 So. 3d at 105 n.1 ("[A] defendant is engaged in the use of deadly force where the 'natural, probable and foreseeable consequences of the defendant's acts are death.'") (quoting *Garramone v. State*, 636 So. 2d 869, 871 (Fla. 4th DCA 1994)). This is especially true here because the video shows that Thompson was stabbing Halley's torso where many vital organs are located. Therefore, the evidence did not support the trial court giving a jury instruction on non-deadly force because the evidence showed that Thompson used the sword in a deadly manner as a matter of law.

Thompson's argument that the trial court erred in giving the initial aggressor exception to the use of deadly force instruction is

also without merit. "Under [stand your ground and justifiable use of deadly force], a person is justified in the use of deadly force and has no duty to retreat if: (1) he is in a place where he has the right to be; (2) he reasonably believes such force is necessary to prevent death or great bodily harm or the imminent commission of a forcible felony; (3) he did not initially provoke the use of force against himself (he was not the initial aggressor); and (4) he was not himself attempting to commit, committing, or escaping after the commission of a forcible felony." *Wyche v. State*, 170 So. 3d 898, 905 (Fla. 3d DCA 2015). Thompson argues that the trial court erred in giving the initial aggressor portion of the justifiable use of deadly force instruction because he did not initiate the fight with Halley.

An initial aggressor instruction is proper when there is evidence in the record that the defendant may have initially provoked the use of force against himself. *Johnson v. State*, 65 So. 3d 1147, 1149 (Fla. 3d DCA 2011). The evidence in this case demonstrates that there were essentially two altercations between Thompson and Halley. Halley was the initial aggressor of the first altercation because he confronted Thompson about adding spices to the gumbo and was first to lay hands on Thompson. This altercation ended when Thompson left the fight and entered the market to retrieve the sword. Halley did not follow Thompson into the market to try to continue the fight. Rather, he was outside gathering his belongings and appeared to be prepared to leave. Thompson, on the other hand, went inside the market with the express purpose of arming himself with the sword. He returned outside and initiated the second fight by swinging the sword and stabbing Halley. These facts lead to the conclusion that any threat to Thompson was over by the time that Thompson armed himself with the sword; thus, Thompson was the initial aggressor during the second altercation. *See Cruz v. State*, 189 So. 3d 822, 827 (Fla. 4th DCA 2015) (recognizing that an altercation can be viewed as two separate events).

Finding no error, we affirm Thompson's conviction and sentence for second degree murder.

AFFIRMED.

B.L. THOMAS, C.J., and M.K. THOMAS, J., concur.

———————————————

*Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.*

———————————————

Andy Thomas, Public Defender, and M. J. Lord, Assistant Public Defender, Tallahassee, for Appellant.

Pamela Jo Bondi, Attorney General, and Virginia Harris, Assistant Attorney General, Tallahassee, for Appellee.

11