DISTRICT COURT OF APPEAL OF FLORIDA
SECOND DISTRICT

_____

CASEY CORDELL,

Appellant,

v.

STATE OF FLORIDA,

Appellee.

No. 2D2024-1370

_____

June 19, 2026

Appeal from the Circuit Court for Hillsborough County; Samantha L. Ward, Judge.

Luke Lirot, Luke Charles Lirot, P.A., Clearwater, for Appellant.

James Uthmeier, Attorney General, Tallahassee, and Tayna Alexander, Assistant Attorney General, Tampa, for Appellee.

ATKINSON, Judge.

Mr. Casey Cordell was charged with and convicted of third-degree murder and attempted felony murder for his actions during a "robbery gone wrong." Mr. Cordell argues on appeal that it was error for the trial court to deny his motion for judgment of acquittal and motion for new trial, both of which were predicated upon his assertion of self-defense.

Mr. Cordell further argues that the trial court erroneously instructed the jury regarding self-defense and regarding the assessment of the credibility of certain witnesses. Finally, Mr. Cordell argues that the cumulative effect of the errors necessitates reversal, an argument this court need not reach. We agree with Mr. Cordell that the trial court committed reversible error in instructing the jury, reverse the final judgment and sentences, and remand for further proceedings consistent with this opinion.

**I.**

On September 6, 2019, Mr. Cordell travelled with his friend, Mr. Kiernan Higbee, to the residence of Mr. Manuel Simmons. Mr. Higbee and Mr. Simmons had arranged for an exchange whereby Mr. Higbee was to supply Mr. Simmons with narcotics in exchange for U.S. currency. Unbeknownst to Mr. Cordell and Mr. Higbee, they were walking into a trap. Mr. Simmons enlisted the help of Mr. Raysheid Melvin, and together they hatched a plan to snatch narcotics from Mr. Higbee and flee the scene without paying. Mr. Melvin was to pose as the buyer while Mr. Simmons acted as the "middleman" who facilitated the transaction between Mr. Higbee and Mr. Melvin. To execute their plot, they disguised a router by wrapping it up in a black trash bag with rubber bands wrapped around the outside of the bag to imitate a stack of money common to Mr. Simmons's experience with these types of transactions.

Mr. Simmons and Mr. Melvin arrived at Mr. Simmons's apartment first. When Mr. Higbee arrived, he was accompanied by Mr. Cordell and the two were carrying a bag which contained several pounds of cannabis. Upon their arrival, the four men smoked cannabis together as a pre-business formality; Mr. Higbee and Mr. Cordell then removed one pound of cannabis from the bag and passed it to Mr. Melvin for inspection. Mr.

Melvin noted his approval and passed the disguised router to Mr. Simmons, who in turn passed it to Mr. Cordell.

Accounts differ as to exactly what happened after the disguised router was passed to Mr. Cordell. Mr. Simmons testified that he immediately snatched the bag containing the rest of the narcotics off a table and fled towards the front door of the apartment; all parties agreed that Mr. Simmons did not make it outside the apartment with the bag. Though there were differing theories and accounts as to how it happened, it was undisputed that at some point Mr. Simmons's gun wound up lying on the apartment floor. Mr. Simmons described that gun's color as "chrome and black." According to Mr. Cordell, Mr. Melvin jumped on top of Mr. Higbee and repeatedly punched Mr. Higbee in the head and when Mr. Cordell looked at Mr. Simmons, Mr. Simmons was drawing "something silver" out of his waistband. Mr. Cordell testified that Mr. Melvin then began running at him, at which point Mr. Cordell began shooting at silhouettes in "the direction where the threat [wa]s" and kept shooting until he felt he was "safe" and "didn't see any threats."

Mr. Higbee testified that once Mr. Melvin got off him, Mr. Higbee covered his head and continued lying down until after the shooting stopped. He also testified that he saw Mr. Melvin lunge towards Mr. Cordell and that he saw Mr. Simmons grabbing at something silver in his waistband that looked like a knife or gun.

After the shooting stopped, Mr. Higbee grabbed the bag and ran for the nearest exit. Mr. Simmons was shot multiple times but ultimately made it to a hospital, survived, and testified at trial. Mr. Melvin was killed by the gunshot wounds he sustained. Mr. Simmons testified that while he was fleeing, he did not see Mr. Melvin or Mr. Higbee; his only perception was that Mr. Melvin was somewhere close behind him when

3

he heard Mr. Melvin make a noise after being shot. Mr. Simmons also testified that he saw Mr. Cordell draw his gun and that prior to seeing that gun drawn, neither he nor Mr. Melvin had made any "aggressive movements" towards Mr. Higbee or Mr. Cordell. Mr. Cordell testified that he was scared for his life, and his entire defense was premised upon the justifiable use of force under sections 776.032, 776.012, and 776.013, Florida Statutes (2019).

## II.

Section 776.013 provides for the justifiable use or threatened use of deadly force in a dwelling or residence:

> A person who is in a dwelling or residence in which the person has a right to be has no duty to retreat and has the right to stand his ground and use or threaten to use . . . [d]eadly force if he or she reasonably believes that using or threatening to use such force is necessary to prevent imminent death or great bodily harm to himself or herself or another or to prevent the imminent commission of a forcible felony.

§ 776.013(1)(b). On appeal, the State conceded that Mr. Cordell did not have a duty to retreat under section 776.013(1)(b) because he was invited to Mr. Simmons's residence.

During the trial proceedings, Mr. Cordell's attorney objected to several proposed jury instructions, one of which included certain language pertaining to instruction "3.6(f) Justifiable Use of Deadly Force." On appeal, Mr. Cordell contends that the trial court committed reversible error when it gave the "forcible felony" portion of the instruction. *See* § 776.041(1) (providing that a defendant is not justified in using force if the defendant "[i]s attempting to commit, committing, or escaping after the commission of, a forcible felony"). The forcible felony language provided to the jury was as follows: "However, the use of deadly force is not justified if you find that the defendant was attempting to

4

commit, committing, or escaping after the commission of felony murder or manslaughter."

When trial counsel objected to the forcible felony instruction, he argued that giving the instruction "could confuse the jury and make them believe that the act of killing itself eliminates the self-defense [argument]." Though counsel's objection was overruled, it was well founded. Because Mr. Cordell was not charged with any forcible felony other than those for which he was asserting the justification of self-defense, the instruction potentially vitiated his defense by indicating to the jury that the charged crimes themselves foreclosed the justification. *See Martinez v. State*, 981 So. 2d 449, 453 (Fla. 2008) ("[T]o instruct the jury on the forcible-felony exception in this circumstance amounted to informing the jury that although it might conclude that Martinez acted in self-defense when he committed an *aggravated battery* or *attempted murder* against Rijo, the use of deadly force was *not justifiable* if the jury found that Martinez committed *attempted murder* or *aggravated battery*."). In order to avoid this "circular logic"—which "would most probably confuse jurors because the apparent result is that the instruction precludes a finding of self-defense and amounts to a directed verdict on the affirmative defense"—"an independent forcible felony is required for the forcible-felony instruction to apply." *See id.* at 453–54.

In other words, "the forcible felony exception to self-defense applies only when the 'accused is charged with at least two criminal acts, the act for which the accused is claiming self-defense and a separate forcible felony.' " *Smith v. State*, 417 So. 3d 503, 507 (Fla. 5th DCA 2025) (quoting *Santiago v. State*, 88 So. 3d 1020, 1022 (Fla. 2d DCA 2012)). "Otherwise, the instruction would be ' "circular and confusing to the jury" because it improperly instructs the jury that the very act that the

5

defendant seeks to justify as an act of self-defense prevents the same act from being an act of self-defense.' " *Id.* (quoting *Smith v. State*, 933 So. 2d 1275, 1276–77 (Fla. 2d DCA 2006)). In this manner, the forcible felony instruction in this case "[wa]s 'capable of misleading the jury in such a way as to prejudice [Mr. Cordell]'s right to a fair trial,' " and, consequently, the trial court abused its discretion by giving it. *See Weir v. State*, 777 So. 2d 1073, 1076–77 (Fla. 4th DCA 2001) (first quoting *Lewis v. State*, 693 So. 2d 1055, 1057 (Fla. 4th DCA 1997); and then citing *Gross v. Lyons*, 721 So. 2d 304 (Fla. 4th DCA 1998), *decision approved*, 763 So. 2d 276 (Fla. 2000)); *Johnson v. State*, 293 So. 3d 46, 53 (Fla. 1st DCA 2020) ("The giving or withholding of a proposed jury instruction is reviewed for abuse of discretion." (citing *Carle v. State*, 983 So. 2d 693, 695 (Fla. 1st DCA 2008))).

### III.

Mr. Cordell also argues that the trial court committed reversible error by giving an "initial aggressor" instruction. *See* § 776.041(2) (providing that a defendant is not justified in using force if the defendant "[i]nitially provokes the use of force against himself or herself" unless a specified exception applies).

The State correctly contends that this argument is not preserved for appellate review. While Mr. Cordell did object to the initial aggressor instruction during a conference with the trial court prior to the close of evidence, Mr. Cordell was informed by the trial court that the instruction would *not* be given because the State was not seeking its inclusion. Later, just before the reading of the instructions, Mr. Cordell's defense counsel renewed his prior objections to the jury instructions, to which the trial court responded, "Same rulings." When the oral and written

instructions were provided to the jury, they inexplicably included the initial aggressor instruction.  Mr. Cordell did not object at that time.[1]

"Jury instruction errors are subject to the contemporaneous objection rule."  *Knight v. State*, 286 So. 3d 147, 151 (Fla. 2019) (first citing *State v. Weaver*, 957 So. 2d 586, 588 (Fla. 2007); and then citing *State v. Delva*, 575 So. 2d 643, 644 (Fla. 1991)).  In most cases, "[t]he objectives of [the contemporaneous objection] rule are satisfied 'when the record shows clearly and unambiguously that a request was made for a specific instruction and that the trial court clearly understood the request and *just as clearly denied the request.*' "  *See Wong v. State*, 212 So. 3d 351, 357–58 (Fla. 2017) (second alteration in original) (quoting *Wong v. State*, 184 So. 3d 1122, 1124 (Fla. 2d DCA 2015), *quashed by* 212 So. 3d at 361); *see also Thomas v. State*, 419 So. 2d 634, 636 (Fla. 1982) ("[I]t is not necessary to [object] and state the grounds therefor where the record shows, clearly and unambiguously, that the request was made and that the trial court clearly understood the request and, just as clearly, denied that specific request.").  Here, though, the record does not reflect that the court clearly denied counsel's request to exclude the initial aggressor instruction—to the contrary, counsel's objection was successful and it was explained that the instruction would not be included.

At the time of the discussion of the instruction that led to the trial court's initial decision to exclude the instruction, the error had not yet occurred—counsel's objection to the instruction was successful, being

---

[1] This contrasts with counsel's treatment of a different instruction, whereby counsel advised the trial court between closing arguments of a mistake in the instructions and the court advised the jurors of the mistake and explained that a corrected written instruction would be provided.

well-taken by the trial court, and a potential error at that time was successfully averted. The times at which an objection would be necessary came later, when the errors occurred—when the trial court read the erroneous instruction to the jury and provided it in written form. Only then could an objection preserve the error for appeal, because before that time no error had occurred.

However, if the instruction was erroneous, it would be fundamental, the establishment of which would be necessary to entitle Cordell to appellate review of the unpreserved error. *See Martinez*, 981 So. 2d at 450–51. "Where the challenged jury instruction involves an affirmative defense, . . . fundamental error only occurs where a jury instruction is 'so flawed as to deprive defendants claiming the defense . . . of a fair trial.' " *Id.* at 455 (quoting *Smith v. State*, 521 So. 2d 106, 108 (Fla. 1988)). When the contested instruction informs the jury "on the defendant's sole defense, 'it is more likely that the error should be regarded as fundamental.' " *See Sims v. State*, 140 So. 3d 1000, 1004 (Fla. 1st DCA 2014) (quoting *Bradley v. State*, 127 So. 3d 806, 808 (Fla. 2d DCA 2013)); *cf. Cruz v. State*, 189 So. 3d 822, 830 (Fla. 4th DCA 2015) ("Fundamental error exists where the defendant's sole defense at trial was that he acted in self-defense, and incorrect jury instructions on the duty to retreat effectively negate that defense." (first citing *Dorsey v. State*, 149 So. 3d 144, 147 (Fla. 4th DCA 2014); and then citing *Richards v. State*, 39 So. 3d 431, 434 (Fla. 2d DCA 2010))).

However, before the necessity to finally resolve whether an error is fundamental arises, this court must determine whether the instruction was erroneous in the first place. It was not.

The relevant language of the instruction is as follows:

8

The use of deadly force is not justified if you find that the defendant used force to initially provoke the use of force himself, unless:

1. The force asserted toward the defendant was so great that he reasonably believed that he was in imminent danger of death or great bodily harm and had exhausted every reasonable means to escape the danger, other than using deadly force on the victim.

2. In good faith, the defendant withdrew from physical contact with the victim and clearly indicated to the victim that he wanted to withdraw and stop the use of deadly force, but the victim continued or resumed the use of force.[2]

"An initial aggressor instruction is proper when there is evidence in the record that the defendant may have initially provoked the use of force against himself." *Johnson,* 293 So. 3d at 55 (quoting *Thompson v. State,* 257 So. 3d 573, 581 (Fla. 1st DCA 2018)); *see also Moorer v. State,* 278 So. 3d 181, 189 (Fla. 1st DCA 2019) (quoting *Thompson,* 257 So. 3d at 580). At trial, the State's theory of the case was that Mr. Melvin and Mr. Simmons never used aggression against Mr. Higbee or Mr. Cordell and

---

[2] The proffered instruction misstated the law by providing the following: "The use of force is not justified if you find that the defendant used force to initially provoke the use of force himself . . . ." The instruction omitted the word "against" and should have read as follows: "The use of force is not justified if you find that the defendant used force to initially provoke the use of force *against* himself . . . ." *See* § 776.041(2) (emphasis added). While that omission may have been confusing, the instruction as a whole was nevertheless capable of correctly instructing the jury. Despite the omission, the instruction informed the jury that the duty to retreat or withdraw applied in the event the jury found that Mr. Cordell initially provoked the use of force. Jury instructions are subject to the test for harmless error, which requires appellate courts to determine "whether there is a reasonable possibility that the error affected the verdict." *See Johnson v. State,* 53 So. 3d 1003, 1007 (Fla. 2010) (quoting *State v. DiGuilio,* 491 So. 2d 1129, 1139 (Fla. 1986)). Because the instruction was capable of correctly instructing the jury as to when the duty to retreat or withdraw applies, the omission was harmless.

that Mr. Cordell's actions therefore did not constitute self-defense. On appeal, Mr. Cordell argues that the initial aggressor instruction was inapplicable to this case because "[t]here was no evidence that [Mr. Cordell] or [Mr. Higbee] were the initial aggressors or provocateurs of the violence that [Mr.] Simmons and/or [Mr.] Melvin committed on [Mr.] Cordell and [Mr.] Higbee." At trial, Mr. Cordell's argument against the instruction was premised on the State's theory that "no force whatsoever was used against the defendant." Mr. Cordell contended that because the State was not "claim[ing] that [Mr. Cordell] provoked any force against himself," the instruction would be inappropriate.

In other words, Mr. Cordell objects to the initial aggressor instruction because the State's primary theory of the case does not rely on a presumption that the victims exerted unlawful force after being provoked by the defendant. Thus, the argument goes, there is no evidence that Mr. Cordell provoked force against himself—because the State contended that the victims never exerted any force at all. But this argument ignores the necessary implications of Mr. Cordell's own argument. He himself quite obviously contended that force was exerted against him. His primary argument at trial was that he acted in *self defense*; his own theory necessarily required the jury to believe that he was presented with the use or threatened use of force by the victims. Thus, the State was entitled to have the jury instructed that Mr. Cordell could not avail himself of the self-defense justification if the jury found he provoked the force that he himself contends was asserted against him. *See* § 776.041 (foreclosing the justification of self defense when the defendant "[i]nitially provokes the use or threatened use of force against himself or herself").

10

In other words, it does not matter whether the State alleged that the victims exerted or threatened force against Mr. Cordell after being provoked by him; if the jury believed the testimony that the victims *did* exert or threaten force against Mr. Cordell and Mr. Higbee, the question of whether Mr. Cordell provoked that force as the initial aggressor would become relevant, justifying the initial aggressor instruction. And the State *did* assert that Mr. Cordell was the initial aggressor—arguing essentially that he was the *only* aggressor, having committed violence against the victims not to defend himself but rather because he was acting to prevent the victim from absconding with the illicit drugs. Underlying Mr. Cordell's argument that the instruction was erroneous is the necessary presumption that in order to justify an initial aggressor instruction, the State must *concede* that the victims exerted force against the defendant, a proposition unsupported by law or logic.

Mr. Cordell and his codefendant Mr. Higbee both advanced the theory that Mr. Simmons and Mr. Melvin initiated the physical aggression by, respectively, reaching for a gun or knife and punching Mr. Higbee in the head then advancing towards Mr. Cordell. For example, in explaining his theory during opening argument to the jury, Mr. Cordell's counsel proffered the following chronology of events:

> [A]s Mr. Higbee is being attacked, my client looks in front of him and sees Mr. Simmons lift his shirt and brandish a silver, shiny object in his waistband. He knows what's about to go down and he has to act fast because Mr. Melvin is coming to him next.
> So what does he do? He takes his firearm and he unloads as he's trying to escape the apartment. He is defending himself and he's defending his friend, Mr. Higbee.

The State need not concede those allegations in order to justify provision of the initial aggressor instruction. The jury was not bound by the precise chronology of the parties' dueling theories, and the evidence

11

at trial did not foreclose the possibility that the jury might conclude that any force that was exerted by the victims was only in response to Mr. Cordell's initial show of force. For example, although the State used the medical examiner's testimony that Mr. Melvin was shot in the back to argue that Mr. Melvin was fleeing when he was shot, the very same testimony indicated that Mr. Melvin was *also* shot in the front, posing the question of whether Mr. Melvin was shot in cold blood, was shot after aggressively advancing toward Mr. Cordell, or was only aggressively advancing toward Mr. Cordell *after being provoked* by Mr. Cordell threateningly brandishing his weapon—the latter of which would indicate that Mr. Cordell was the initial aggressor who provoked the force asserted against himself. At bottom, the State advanced a theory that Mr. Cordell was the initial aggressor, Mr. Cordell advanced a theory that he was responding to force exerted by the victims, and evidence supported both theories. The State need not concede that the victims asserted force against Mr. Cordell to allow for the possibility that any such force *alleged by* Mr. Cordell could, in jurors' minds, have been provoked by Mr. Cordell as the initial aggressor. Accordingly, it was not erroneous to give the instruction. *See Johnson v. State*, 65 So. 3d 1147, 1149–50 (Fla. 3d DCA 2011) (holding that it was proper to instruct "the jury as to the aggressor instruction of the Justifiable Use of Force because there was evidence in the record that Johnson may have initially provoked the use of force against himself" (first citing § 776.041(2), Fla. Stat. (2010); and then citing *Martinez*, 981 So. 2d at 452)).

## IV.

Mr. Cordell's arguments that the trial court erred by denying his motions for judgment of acquittal and for new trial are also unavailing. Mr. Cordell contends that he presented a prima facie case of self-defense

12

and that the State did not prove beyond a reasonable doubt that he did not act in self-defense. A judgment of acquittal is warranted on these grounds "when the State's evidence is legally insufficient to rebut the defendant's testimony establishing self-defense." *See Fowler v. State*, 921 So. 2d 708, 711–12 (Fla. 2d DCA 2006) (first citing *State v. Rivera*, 719 So. 20 335, 337 (Fla. 5th DCA 1998); and then citing *Sneed v. State*, 580 So. 2d 169, 170 (Fla. 4th DCA 1991)).

> [A] motion for judgment of acquittal should be denied where a jury could reasonably infer guilt and reject the defendant's explanation of self-defense, either because the defendant gave false, inconsistent, or incriminating statements, or because a common sense view of the circumstantial evidence would allow the jury to reject the defendant's theory as unbelievable.

*Cruz*, 189 So. 3d at 826 (first citing *Romero v. State*, 901 So. 2d 260, 265–66 (Fla. 5th DCA 2005); and then citing *Hampton v. State*, 549 So. 2d 1059, 1060–61 (Fla. 4th DCA 1989)).

Viewing the facts and circumstances in the light most favorable to the State, the trial court did not err by denying Mr. Cordell's motions for judgment of acquittal. Mr. Simmons testified that prior to seeing Mr. Cordell draw his gun, he had not seen Mr. Melvin make any "aggressive movements" towards either Mr. Higbee or Mr. Cordell and that he did not make any himself. Additionally, testimony elicited from law enforcement officers and the medical examiner—such as the room-length separation from the spent casings where Mr. Cordell was presumably standing and the bullet holes and projectiles "near the [front] door" and the lack of any "evidence of close range of firing"—supported an inference that Mr. Cordell remained a good distance from the victims throughout the shooting as opposed to a scenario in which he was firing at aggressive assailants quickly closing the distance between them and himself. *Cf. Johnson*, 293 So. 3d at 55 (holding that evidence of "gun shot trajectory

13

and the victim's injuries" can be considered to determine whether the defendant was the initial aggressor and rebut the defendant's own testimony).

Granted, some evidence did support Mr. Cordell's self-defense theory. His account that he saw Mr. Simmons brandish some type of metallic weapon was conspicuously corroborated by the discovery of Mr. Simmons's metallic firearm left at the scene of the shooting. And the surviving victim, Mr. Simmons, admitted that he and the other victim, Mr. Melvin, had planned from the outset to rob the defendant and Mr. Higbee as opposed to pay for the cannabis—a concession tending to corroborate a theory that they might be willing to employ violence to effectuate their design to make off with the merchandise without paying for it.

Moreover, if the jury had concluded that Mr. Cordell had an initially reasonable belief that deadly force "[w]as necessary to prevent imminent death or great bodily harm to himself or" Mr. Higbee "or to prevent the imminent commission of a forcible felony," *see* § 776.013(1)(b), the fact that some of the rounds struck the victims in the back and buttocks would not categorically preclude the justification of self-defense. The evidence adduced by all parties tended to show that once the shooting began, it occurred in one short, continuous spree until Mr. Simmons had escaped and Mr. Cordell felt safe. Depending on the circumstances, evidence that victims "appeared to be retreating . . . does not mean that the threat to [the defendant] at first reasonably apprehended necessarily dissipated." *Cf. Bouie v. State*, 292 So. 3d 471, 482–83 (Fla. 2d DCA 2020) (disagreeing with a "trial court's conclusion that [the defendant's] belief that deadly force was necessary ceased to be reasonable when [the defendant] continued firing shots while [the victim]

14

appeared to be retreating" because "[a]n armed man can continue to pose a threat of death or imminent bodily harm even when he is seeking cover behind or inside a car" and the evidence showed that the "entire episode unfolded quickly" (citing *State v. Gallo*, 76 So. 3d 407, 408–09 (Fla. 2d DCA 2011))).

However, even though some evidence corroborates Mr. Cordell's theory that he was acting in self-defense when he was forced to escalate the physical altercation that was initiated by the victims into an inchoate firefight in which he ultimately prevailed, there was other evidence from which the jury could disbelieve his theory and conclude that the victims were not the initial aggressors (or not aggressors at all). *Cf. Bouie*, 292 So. 3d at 482 ("[T]he State did not produce any evidence to show that the threat of imminent death or great bodily harm which the trial court indicated was initially reasonable to believe Mr. Favors posed would have appeared to a reasonable person to have evaporated after Mr. Favors used a car for cover."). "[W]hen reviewing a judgment of acquittal, the appellate court must . . . 'consider the evidence and all reasonable inferences from the evidence in a light most favorable to the [S]tate.' " *State v. Konegen*, 18 So. 3d 697, 699 (Fla. 4th DCA 2009) (second alteration in original) (first quoting *Jones v. State*, 790 So. 2d 1194, 1197 (Fla. 1st DCA 2001) (en banc); and then citing *Darling v. State*, 808 So. 2d 145, 156 (Fla. 2002)); *see also Yudin v. State*, 117 So. 3d 457, 459 (Fla. 2d DCA 2013) ("An appellate court reviews the denial of a motion for judgment of acquittal de novo and affirms the conviction if it is supported by competent, substantial evidence." (citing *Boyd v. State*, 910 So. 2d 167, 180 (Fla. 2005))). And "[i]n deciding a motion for new trial . . . on the ground that the verdict is contrary to the weight of the evidence, the trial court" must determine "whether a greater amount of credible

15

evidence supports one side of an issue or the other," "weigh[ing] the evidence and . . . determin[ing] the credibility of witnesses so as to act, in effect, as an additional juror." *See Geibel v. State*, 817 So. 2d 1042, 1044 (Fla. 2d DCA 2002) (first citing Fla. R. Crim. P. 3.600(b); then citing *State v. Hart*, 632 So. 2d 134, 135 (Fla. 4th DCA 1994); then citing *Moore v. State*, 800 So. 2d 747 (Fla. 5th DCA 2001); and then quoting *Uprevert v. State*, 507 So. 2d 162, 163 (Fla. 3d DCA 1987)).

Mr. Simmons's testimony that Mr. Cordell was the initial and only aggressor—or at least that any threat from the victims had abated before Mr. Cordell fired fatal shots—was corroborated not only by the evidence of the trajectory and impact of the rounds fired by Mr. Cordell, but by Mr. Cordell's own words when he called 911 after the incident. During that call, Mr. Cordell made the following remarks:

> They are probably dead. They are on the ground not moving. I just pulled the trigger, I didn't stop firing. I was scared for my life. I didn't know what to do. He punched – he tried to punch me and stuff, he came at me with a knife, I didn't know what to do. And then they – like when I was shooting, after they ran away from me, they saw me with a gun and started like – I shot at them and they ran away.

Not altogether inconsistently, Mr. Simmons testified that as soon as he handed the fake stack of money over, he "tried to snatch the bag [of cannabis] and the pound [of cannabis] that was on the table and . . . ran to the door," but when he reached to open the front door, he "felt a surge go through [his] body," "dropped the bag and tried to open the door," and when he opened the door he "got hit in the back of [his] buttocks area." The evidence was such that the question of whether Mr. Cordell acted in justifiable self defense was one for the jury, and the trial court did not err by denying his motions for judgment of acquittal.

16

## V.

Mr. Cordell also argues that it was error to include the example provided in the following instruction:

> Accomplices and Informants. You must consider the testimony of some witnesses with more caution than others. *For example, a witness who claims to have helped the defendant commit a crime or has been promised immunity from prosecution or hopes to gain more favorable treatment in his or her own case may have a reason to make a false statement in order to strike a good bargain with the State.* This is particularly true when there is no other evidence tending to agree with what the witness says about the defendant. So, while a witness of that kind may be entirely truthful when testifying, you should consider his or her own testimony with more caution than the testimony of other witnesses. However, if the testimony of such a witness convinces you beyond a reasonable doubt of the defendant's guilt, or the other evidence in the case does so, then you should find the defendant guilty.

(Emphasis added.) As he did in the trial court, Mr. Cordell objects to the inclusion of the emphasized examples, arguing that Mr. Simmons was the only witness who could fit within that example but was not a codefendant in these proceedings, thereby confusing the jury as to how his testimony should be treated. However, Mr. Cordell does not elaborate on his argument that the instruction would confuse the jury. He makes no effort to explain why application of the instruction to the testimony of Mr. Simmons would cause confusion. Moreover, despite circumstances tending to indicate that the instruction would *not* apply to Mr. Simmons—who did not "claim[] to have helped" Mr. Cordell "commit a crime" but rather was in an arms-length drug transaction and admitted to his plan to rob Mr. Cordell instead—if the instruction *were* to be applied to Mr. Simmons it would only tend to help Mr. Cordell at trial by inviting heightened scrutiny of Mr. Simmons's inculpatory testimony.

17

Because Mr. Cordell has not adequately explained his argument regarding juror confusion or even mentioned how the instruction could have prejudiced him, he has not established reversible error.

**VI.**

Because the trial court erred by giving the forcible felony jury instruction, Mr. Cordell's judgment and sentences must be reversed.

Reversed and remanded.

NORTHCUTT and BLACK, JJ., Concur.

———————————————————

Opinion subject to revision prior to official publication.